## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DUANE LAMAR SMITH,

      Plaintiff,

v.

WAYNE COUNTY, a political subdivision,
of the State of Michigan, CITY OF DETROIT,
a municipal corporation, PATRICK MCNULTY,
in his individual and official capacity, MICHAEL
RUSSELL, in his individual and official capacity,
And DONALD OLSEN, in his individual and
official capacity.

      Defendants.

Case No.
Hon.

---

FLOOD LAW, PLLC
Todd F. Flood (P58555)
Allexa Otto (P87961)
*Attorneys for Plaintiff*
155 W. Congress St., Ste. 350
Detroit, MI 48226-3267
PH: (248) 547-1032
FX: (248) 547-0140
tflood@floodlaw.com
aotto@floodlaw.com

---

## COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff, DUANE LAMAR SMITH, by and through his

attorneys, TODD F. FLOOD and FLOOD LAW, PLLC, and for his Complaint in

this matter, states as follows:

## INTRUCTION

This civil rights action represents a catastrophic failure of the criminal justice system wherein both Wayne County and the City of Detroit, through their respective agents, acted individually and in concert to systematically manipulate evidence, suborn perjury, and orchestrate the wrongful conviction of Duane Lamar Smith for a crime that did not occur.  From his arrest on March 5, 2013, to his release on June 18, 2024, **Duane Lamar Smith spent 4,123 days, or 11 years, 3 months, and 13 days in jail and/or prison for a crime that did not occur.**  The gravamen of this case revolves around a conspiracy of constitutional violations including, but not limited to, the intentional manipulation of an arson investigation report, suppression of exculpatory witness statements and photographs, a government expert witness lying under oath, an undisclosed payment in exchange for testimony, and the procurement of manipulated witness statements by a disgraced homicide investigator. The Defendants' egregious conduct demonstrates a brazen disregard for constitutional principles that demands not only civil compensation for the irreparable harm caused to an innocent man's life, but also systemic reform to ensure that such a perversion of justice – where those sworn to protect the law become its most dangerous violators – never again masquerade as legitimate law enforcement in society.

## JURISDICTION, VENUE, AND PARTIES

1.      This is a civil rights action brought under 42 U.S.C. §1983 to redress the deprivation under color of law of Plaintiff Duane Lamar Smith's rights as secured by the United States Constitution. Plaintiff seeks damages for the violation of his constitutional rights that resulted in his wrongful conviction and over eleven (11) years of unjust imprisonment for a crime that did not occur.

2.      Jurisdiction is founded upon 28 U.S.C. §1331, 28 U.S.C. §1343, and pendent jurisdiction of this Court to hear closely related state law claims.

3.      Forum is proper based on the situs of the incident, which occurred in the City of Detroit, County of Wayne, State of Michigan, within the Eastern District of Michigan.

4.      Plaintiff DUANE LAMAR SMITH is a resident of the County of Wayne, State of Michigan. Mr. Smith is more commonly known as Duane Lamar Williams. At the time of his wrongful conviction, he was forty-three (43) years old.

5.      Defendant, WAYNE COUNTY, is a political subdivision of the State of Michigan duly organized to carry out governmental functions under the laws of Michigan, one of the functions being to create and implement policies and practices, and to organize, operate, staff, and supervise its sheriff's deputies and prosecuting attorneys. Defendant WAYNE COUNTY was the employer of detective Anthony Domek.

6.      Defendant, CITY OF DETROIT, at all pertinent times was a municipal corporation formed under the laws of the State of Michigan. Defendant CITY OF DETROIT operated the DPD and Detroit Fire Department, and was the employer of Defendants MCNULTY, RUSSELL, and OLSEN.

7.      Defendant PATRICK MCNULTY was, at all times relevant to this action, a Captain and fire investigator for the Detroit Fire Department, acting under color of law and within the scope of his employment in connection with the investigation of the house fire, which resulted in Plaintiff's wrongful conviction. Defendant MCNULTY was the lead fire investigator for the house fire and is personally responsible for much of the misconduct alleged in this complaint. He is sued in his individual and official capacities.

8.      Defendant MICHAEL RUSSELL was, at all times relevant to this action, a Sergeant with the Detroit Police Department, acting under color of law and within the scope of his employment in connection with the investigation of the house fire, which resulted in Plaintiff's wrongful conviction. He is sued in his individual and official capacities.

9.      Defendant DONALD OLSEN was, at all times relevant to this action, an investigator with the Detroit Police Department, acting under color of law and within the scope of his employment in connection with the investigation of the house

fire, which resulted in Plaintiff's wrongful conviction. He is sued in his individual and official capacities.

10. Defendants MCNULTY, RUSSELL, and OLSEN, as sworn police officers, had taken an oath, the Law Enforcement Code of Ethics, that stated, in pertinent part: "*As a law enforcement officer, my fundamental duty is to serve the community; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation, the peaceful against violence or disorder; and to respect the constitutional rights of all to liberty, equality, and justice*."

11. Defendants as-yet-unknown fire investigators, prosecuting attorneys, and law enforcement officers were respectively employed by the Detroit Police Department (hereinafter "DPD"), Detroit Fire Department (hereinafter "DFD"), or the Wayne County Prosecutor's Office (hereinafter "WCPO"), acting under color of law and within the scope of their employment in connection with the investigation of the house fire, which resulted in Plaintiff's wrongful conviction. Plaintiff brings this suit against each investigator, prosecutor, and/or officer described in this paragraph in his or her individual and official capacities.

## FACTUAL BACKGROUND

### *The House Fire*

12.    On August 20, 2012, a catastrophic residential fire occurred at 12860 Fielding Street in Detroit, Michigan, resulting in the tragic deaths of Bobby Cross and Darryl Simms, both of whom were long-term residents of the property.

13.    Mr. Simms was known to be a habitual cigarette smoker who frequently smoked and slept on the living room couch where the fire originated.

14.    The lead fire investigator, then-Captain Patrick McNulty, conducted an examination of the scene immediately following the fire.

15.    Defendant McNulty classified the fire's cause as undetermined. The medical examiner ruled the deaths accidental, as there was no evidence to suggest foul play or intentional arson.

16.    In the course of his initial fire investigation, Defendant McNulty documented a critical finding in his Tiburon CAD report (hereinafter referred to as "Original Fire Report"): "a Zippo Style lighter was found in the debris of the east end of the couch."

17.    To substantiate Defendant McNulty's observation of a Zippo-style lighter, two photographs were taken depicting the lighter's precise location on the couch within the fire's origin point. **Exhibit 1 – FOIA Photographs.**

18.    Despite Defendant McNulty discovering this potential ignition source, the lighter remains missing.

***The Jailhouse Informant***

19.     For three months after the Fielding house fire, the DPD took no action, did not conduct an investigation, and left the matter classified as an accident.

20.     Then, in late November of 2012, Gary Jennings was arrested and charged with felony and misdemeanor violations. At the time of his arrest, Mr. Jennings was on probation for previous similar misconduct.

21.     While being held in jail, Mr. Jennings asked to speak with an officer of the DPD regarding information he claimed to have about a homicide. Mr. Jennings met with Sgt. Michael Russell of the DPD for an interview. The interview was not video or audio recorded.

22.     In the unrecorded statement taken by Sgt. Russell, Mr. Jennings claimed that he was contacted by DaShon Seabrooks who gave him information about Plaintiff's alleged involvement in the Fielding house fire. Mr. Jennings claimed he then called Plaintiff, who confessed to starting the fire.

23.     Law enforcement never verified the alleged phone call between Mr. Jennings and Plaintiff.

24.     In January of 2013, based on Mr. Jennings' uncorroborated statement, Sgt. Russell contacted the medical examiner, who subsequently changed the manner of death for Mr. Cross and Mr. Simms from accident to homicide.

25.     On March 4, 2013, Mr. Jennings called Plaintiff and stated, "I lied to the police. Wherever you are leave right now."

26.     Plaintiff was arrested the next day.

*The Evidence Suppression Scheme*

27.     When Defendants' investigation failed to produce evidence supporting Mr. Jennings' claim that Plaintiff had confessed, Defendants concealed exculpatory evidence that demonstrated Plaintiff's innocence.

28.     The Defendants' motivations were mutually understood among themselves and fundamentally compromised both their investigation's credibility and eventually, the integrity of evidence presented to the jury.

29.     Despite the fire being classified as indeterminate in Defendant McNulty's Original Fire Report, with no evidence of foul play or arson, Defendants refused to accept these conclusions. Instead, Defendants acted individually and in concert to manipulate evidence and convict Plaintiff for a crime that did not occur.

30.     Specifically, Defendants sought to deliberately conceal evidence of an accidental fire, including the discovery of the Zippo lighter referenced in the Original Fire Report.

31.     In pursuit of Defendants' scheme, Defendant McNulty's Original Fire Report was altered and redacted to remove sentences regarding the discovery of a lighter and other smoking-related items, reducing the report from seven to six pages.

32.    Defendants doctored Defendant McNulty's Original Fire Report well before Plaintiff's preliminary hearing on March 19, 2013, during which the modified fire report was stipulated to.

33.    This manufactured fire report was used as a basis to assert probable cause for a crime that was never committed and bind Plaintiff over for trial.

34.    By omitting documentation regarding the discovery of a lighter at the fire's point of origin, Plaintiff's defense counsel was deprived of critical information in preparation for trial, including, but not limited to, the lighter's condition, whether it contained fuel, exhibited signs of recent use, or bore any identifiable fingerprints or DNA, and, ultimately, whether the lighter was a potential cause of the accidental fire for which Plaintiff was being wrongfully accused.

35.    Marc Fennel, an expert in fire investigations, was consulted by the defense on appeal and informed the parties that the Zippo lighter should have undergone forensic examination to determine whether it contained fluid and was operational, as this could have provided an explanation for the accidental fire.

36.    It is standard to protocol to collect all evidence that could be an incendiary device, which includes, but is not limited to, lighters.

37.    The lighter found at the origin of the fire, along with any documentation regarding its preservation, is missing and was never turned over to the defense.

**The Trial of an Innocent Man**

38.     During trial, beginning on August 12, 2013, the prosecution argued the Fielding house fire was intentionally set by Plaintiff.

39.     The ongoing effort to develop and present fabricated evidence was clear during Plaintiff's trial. In carrying out their corrupt scheme, Defendants conspired to manufacture testimony at trial by having Defendant McNulty falsely testify under oath that his search of the debris revealed no smoking materials. The Zippo-style lighter found at the scene is a smoking material.

***Perjury***

40.     Specifically, the prosecutor solicited materially false testimony from Defendant McNulty, who, as a Government expert witness and lead fire investigator, lied under oath and/or mislead the jury on at least eight occasions, including, but not limited to, the following:

> a. Defendant McNulty testified that his search for ignition sources yielded **only** co-axial wiring, which he allegedly ruled out as a potential cause. **Exhibit 2, pp. 69 – McNulty's Trial Testimony.** Defendant McNulty intentionally omitted the fact that a Zippo lighter was found in the debris, which Defendant McNulty documented the discovery of in his Original Fire Report.

> b. Defendant McNulty falsely testified that a witness stated one of the victims did not smoke on the couch. **Exhibit 2, pp. 71.** Defendant McNulty's Original Fire Report indicated only that the witness reported the victim **also** smoked in the center west bedroom.

> c. Defendant McNulty falsely denied finding any evidence of smoking around the fire's origin point, despite his Original Fire Report documenting the presence of a Zippo lighter in that exact location. **Exhibit 2, pp. 79.**

d. Defendant McNulty falsely testified to finding no potential ignition sources or "sufficient source[s] to sustain combustion" around the origin point, again concealing the lighter's discovery documented in his Original Fire Report. **Exhibit 2, pp. 81-82.**

e. During cross examination, Defendant McNulty perjured himself claiming the "Michigan Fire Incident Report" provided to defense counsel was identical to "his report," knowing the defense's version had been intentionally altered to remove reference to the lighter. **Exhibit 2, pp. 91.**

f. Defendant McNulty committed perjury by testifying he "had no evidence to support an accidental fire" and "no evidence to support there was smoking." **Exhibit 2, pp. 103.**

g. Defendant McNulty testified that he found evidence of smoking in the bedroom where the decedents were found, but no evidence of smoking in the area of origin.[1] **Exhibit 2, pp. 70.** Again, Defendant McNulty made no mention of the Zippo lighter he found at the area of origin.

h. Defendant McNulty testified that it is extremely difficult to light a couch on fire with a cigarette; however, this goes against scientific evidence and testing as it relates to the flammability of couches. **Exhibit 2, pp. 99.** As noted in the video attached in Exhibit 3, in less than four minutes, the carpet and other furnishings start to break down into vaporous fuels, including carbon monoxide.[2] **Exhibit 3 – Cigarette Burning Chair Video**; https://youtu.be/Di9miUhUnWw.

41.     Defense counsel, having only been provided the deliberately doctored six-page version of Defendant McNulty's report that omitted the presence of a lighter at the fire's origin, was unable to question Defendant McNulty about this

---

[1] The previously undisclosed Original Fire Report and the photos of the lighter could have been used to impeach Defendant McNulty and to advance the defense theory of an accidental and careless fire.

[2] It merits mention that decedents died of carbon monoxide poisoning.

crucial piece of evidence, despite advancing a theory that careless smoking caused the fire.[3]

42.     The existence of a lighter at the fire scene remained concealed from Plaintiff until the Original Fire Report's discovery through a FOIA request in 2021.

43.     Mr. Fennel, an expert in fire investigation, reviewed the testimony of Defendant McNulty and found that Defendant McNulty's investigation and trial testimony were factually and scientifically flawed, including his failure to disclose the presence of a Zippo lighter found in the debris, his improper ruling out of accidental causes and electrical failure, and his reliance on confirmation bias that contravened established fire investigation protocols as outlined in the National Fire Protection Association 921- Guide for Fire and Explosion Investigation. **Exhibit 4 – Marc Fennel Statement.**

44.     Defendants and other unknown conspirators have never sought to correct the record and/or disclose the exculpatory evidence eventually disclosed via a FOIA request nearly a decade later.

*Star Witness Incentivized and Contradicted by Suppressed Statements*

45.     Mr. Jennings, the prosecution's star witness linking Plaintiff to the fire, stated that he first learned about the fire through DaShon Seabrooks. According to

---

[3] It was well known that the individuals who resided in the Fielding home at the time of the fire were all habitual cigarette smokers and often smoked on the couch that was determined to be the origin of the fire.

Mr. Jennings' testimony, Mr. Seabrooks allegedly encouraged him to contact Plaintiff to discuss Plaintiff's involvement in the house fire. Thereafter, Mr. Jennings alleges that Plaintiff confessed to his involvement.

46.    While several deficiencies in this alleged confession exist, more disturbing is that Wayne County Investigator Anthony Domek interviewed the so-called mutual friend, Mr. Seabrooks, at the prosecutor's request, and Mr. Seabrooks explicitly stated that he did not know Mr. Jennings.

47.    Further, Mr. Seabrooks stated he did not have knowledge regarding Plaintiff nor of a house fire until Detective Domek informed him of such during his interview.

48.    This exculpatory statement was memorialized by Detective Domek, but not turned over to defense in discovery. **Exhibit 5 – Affidavit of Michael J. McCarthy.**

49.    Further, Defendant Olsen testified he personally talked to Mr. Seabrooks in February of 2013.

50.    Documentation of Defendant Olsen's interview does not exist. Defendant Olsen deliberately chose not to write a field note or otherwise document the interview.

51.    Mr. Seabrooks would have been an important corroborating witness to Mr. Jennings' trial testimony. In fact, Mr. Seabrooks was originally listed as a

possible prosecution witness, but he was later removed from the Government's list without explanation.

52.     Mr. Seabrooks' removal from the prosecution's witness list was attributable to his statement contradicting Mr. Jennings' account, which would have severely undermined the prosecution's case.

53.     Adding to the skepticism of Mr. Jennings, he failed to show up to the first trial date which caused a witness detainer motion to be filed by the prosecution and an adjournment of the trial.[4]

54.     Mr. Jennings ultimately had his felony charges dismissed and instead plead guilty to a misdemeanor possession of marijuana offense.

55.     In addition to the sweetheart deal Mr. Jennings received, he was paid a five thousand dollar ($5,000.00) reward for his testimony in Plaintiff's case by the Michigan Arson Prevention Committee. The Wayne County Prosecutor handling Plaintiff's case and Defendant Olsen not only recommended but actively advocated for Mr. Jennings to receive this payment.

56.     Complicating Mr. Jennings' testimony further, the WCPO coincidentally lost Mr. Jennings' case file. This presented issues in Plaintiff's trial

---

[4] In a motion by the prosecution, there is mention of tracking phone activity. Noteworthy is that none of the phone activity, including, but not limited to, text messages, phone tracking, and Electronically Stored Information (ESI), was ever turned over to the defense. Upon information and belief, either no workup was ever done on the phone, or it was done and not turned over.

as the defense could not properly examine the docket attorney as to why Mr. Jennings got his new felony case dismissed.

57.     Mr. Jennings was undoubtably a key witness for the prosecution in Plaintiff's trial. Indeed, no charges were brought against Plaintiff until Mr. Jennings approached law enforcement with his alleged confession account.

58.     The defense's ability to impeach Mr. Jennings would have been critical to Plaintiff's defense. An important part of such impeachment could have been testimony offered by Mr. Seabrooks.

59.     However, defense counsel was never made aware of Mr. Seabrooks' statement to Detective Domek in July of 2013 and was therefore stripped of the opportunity to fairly defend Plaintiff.

***The Conviction of an Innocent Man***

60.     In September of 2013, at the conclusion of Plaintiff's trial, the jury was initially deadlocked.

61.     During deliberations, the jury requested the transcript of Defendant McNulty's testimony and documents used during his testimony, including the fire report.

62.     Eventually, following a trial marred by investigative misconduct and the deliberate suppression of exculpatory evidence, Plaintiff was wrongfully convicted of second-degree murder, felony murder, and arson.

63.     On October 2, 2013, the trial court sentenced Plaintiff to a controlling sentence of mandatory life in prison without the possibility of parole, commencing Plaintiff's eleven-year wrongful imprisonment for a crime that did not occur.

64.     Following the exhaustion of Plaintiff's direct appeal, defense counsel obtained,[5] through FOIA requests, fifty-eight (58) previously undisclosed photographs from the fire scene investigation. Among these suppressed photos were two critical images documenting the Zippo-style lighter among the debris at the fire's origin point. **Exhibit 1.**

65.     The FOIA materials also revealed the existence of Defendant McNulty's seven-page Original Fire Report.

***The Cover-Up Revealed***

66.     In 2022, Plaintiff's case was reviewed by the Conviction Integrity Unit (hereinafter "CIU") of the WCPO.

67.     The CIU's examination of the prosecution's trial file disclosed the existence of eight distinct Fire Reports contained therein:

    a.  Report #1: Computer Aided Dispatch ("CAD") Report with page four omitted, said page containing the description of the suspected area of origin and evidentiary materials. **Exhibit 6 – Prosecutor's Report 1.**

    b.  Report #2: Unofficial report that appears to have been created by extracting solely the narrative text portion from the CAD Report and importing said narrative into Microsoft Word or a similar processing software. While the area of origin appears on page three, the sentence

---

[5] In 2021, the State Appellate Defender Office was appointed to represent Plaintiff.

documenting the Zippo lighter and its condition has been excised. The pagination of this Report differs from Report #1, with the "Additional Facts" portion of the Report appearing on page six rather than page three. This copy appears to have been redacted through the use of electronic redaction software or physical white-out tape. **Exhibit 7 – Prosecutor's Report 2.**

c. Report #3: Substantially identical to Report #2; however, the redactions appear to have been executed through a combination of grease pencil, white-out tape, or electronic redaction software. **Exhibit 8 – Prosecutor's Report 3.**

d. Report #4: Identical to Report #3. **Exhibit 9 – Prosecutor's Report 4.**

e. Report #5: CAD Report Printed on March 28, 2013, eight days subsequent to the printing of Report #1. This report is identical to Report #1, however, it includes page four. Page four contains a detailed description of the area of origin and documentation of the presence of a Zippo-style lighter. **Exhibit 10 – Prosecutor's Report 5.**

f. Report #6: Identical to Report #2 with the exception that the "Additional Facts" page appears on page two rather than page six. The area of origin is documented on page four; however, the sentence referencing the Zippo lighter has been omitted. **Exhibit 11 – Prosecutor's Report 6.**

g. Report #7: Unofficial report that bears evidence of a facsimile transmission on November 29, 2012, at 9:27 AM. No reference to a Zippo lighter appears in this Report. The facsimile transmission process appears to have caused significant distortion, rendering complete sentences either illegible or entirely absent. **Exhibit 12 – Prosecutor's Report 7.**

h. Report #8: Generated on the same date as CAD Report #1 but includes page four, which documents the presence of the Zippo lighter. **Exhibit 13 – Prosecutor's Report 8.**

68. The documentation of a Zippo lighter in the area of origin appears exclusively in Reports #5 and #8, while being absent from all other Reports where

17

the narrative portion was separated from the original CAD Report. **Exhibit 10 and 13.** Report #1 lacks page four in its entirety, precluding any determination regarding whether the lighter was documented in that version. **Exhibit 6.** Reports #2, #3, #4, #6, and #7 originate from unknown sources and appear to be "cut and paste" Word processing documents. **Exhibit 7, 8, 9, 11, and 12.**

69.    Report #7, a document fabricated to exclude reference to the Zippo lighter, was facsimiled on November 29, 2012, *the same day* Defendant Russell conducted his unrecorded interview with jailhouse informant Mr. Jennings. **Exhibit 12.**

70.    The Original Fire Report was not disclosed until sometime on or after May 10, 2013, when Defendants McNulty, Russell, and Olsen selectively provided the report to the prosecution in preparation for trial. Even then, the Original Fire Report was never disclosed to the defense.

71.    In stark contrast to the prosecution's file, Plaintiff's defense attorney's file contained only a copy of the altered, 'cut and paste' six-page narrative fire report, from which the reference to the Zippo-style lighter had been removed. **Exhibit 14.**

72.    During Plaintiff's trial proceedings, defense counsel asked Defendant McNulty whether the report in his possession on the witnesses stand consisted of six pages. Defendant McNulty responded that it contained "seven" pages and stated: "I'm looking at your report. I'm looking at the Michigan Fire Incident Report. That's

an official report. What you're looking at is a report that, ***my*** report specifically," and further represented "***it's the same report, it's just - - word product***." **Exhibit 2, pp. 91.**

73.     At this point in the proceedings, Defendant McNulty possessed actual knowledge that defense counsel had been furnished with a materially altered fire report that omitted exculpatory evidence.

74.     Defendant McNulty failed to correct the record or disclose the existence of the Original Fire Report to Plaintiff's defense counsel.

75.     Moreover, the Conviction Integrity review of the prosecutor's trial file revealed that certain photographs were not in the prosecutor's file. Two of the photographs ***not*** in the prosecutor's file include the images documenting the Zippo lighter among the debris. **Exhibit 1; Exhibit 15, pp. 8 – Transcript of Motion Hearing to Vacate Conviction.**

76.     The photographs taken at the scene were taken by Defendant McNulty. **Exhibit 2, pp. 50.** The photographs missing from both the prosecution and defense files are in direct violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

***Suppressed Evidence***

77.     The CIU review of the police and prosecutor's files revealed several other pieces of undisclosed evidence favorable to Plaintiff.

78.     Deborah Simms and Jacqueline Cross each testified at Plaintiff's trial that they had received information about the fire, including Plaintiff's alleged involvement, from a man named Ron Rogers. Mr. Rogers, like Mr. Seabrooks, was on the prosecution's witness list but did not testify. Mr. Rogers, prior to trial, had told Detective Domek that he did not know anything about who started the fire, completely undermining the testimony of Ms. Simms and Ms. Cross. This pre-trial statement was never turned over to defense. **Exhibit 5.**

79.     Further, at trial, Mr. Jennings testified that his "friend," Shana Tyler, told him about the fire. Ms. Tyler was not called as a witness by either party. The CIU learned in 2024 that Ms. Tyler and Mr. Jennings were in a romantic relationship and living together at the time of the fire. Ms. Tyler explained that she is related to the decedents and learned information about the fire from her family members, including that they blamed Plaintiff for the fire. Ms. Tyler stated that she learned this information within a week after the fire and she told Mr. Jennings what she heard from her family members immediately after learning it. Ms. Tyler further described Mr. Jennings as untrustworthy.

80.     Moreover, at trial, Ms. Cross testified that she arrived at the scene when the fire was still burning and was there at the same time as the first responders. There is no statement in the police file from her from the morning of the fire.

81.     Ms. Cross testified that, about a month after the fire, a DPD officer came to her home to interview her; she believed it was Sgt. Russell. There is nothing in the police file about a police home-interview with Ms. Cross.

82.     Additionally, Detective Domek obtained historical first responder call records for the Fielding address, which revealed Mr. Simms' significant medical and physical condition prior to the fire. These records were never disclosed to the defense.

83.     The Defendants' *Brady* violations were not a mere oversight but rather a deliberate and orchestrated act to strengthen the prosecution's case at the expense of truth and justice, and a willful disregard for Plaintiff's constitutional right to due process.

**Pattern Evidence of Defendants' Misconduct**

84.     In 2005, Sgt. Russell was accused of coercing a suspect into signing a statement by promising assistance with his parole and assuring him he would not be charged with murder. It was further alleged that Sgt. Russell attempted to bribe the suspect by stating that if he helped law enforcement target another individual, Sgt. Russell would help him in return. Sgt. Russell also allegedly instructed the suspect to coordinate his statement with that of another witness.

85.     Thereafter, in 2007, Sgt. Russell again fabricated evidence against 14-year-old Devontae Sanford, which facilitated Mr. Sanford's murder convictions.

Specifically, the Sixth Circuit Court of Appeals held that Sgt. Russell was not entitled to qualified immunity, finding that a reasonable jury could conclude that:

    a. Sgt. Russell falsely told Mr. Sanford that officers had found blood on his shoes;

    b. Sgt. Russell falsely promised that Mr. Sanford could go to school the next day if he hurried up and confessed;

    c. Sgt. Russell drafted a false confession; and,

    d. Ultimately, that Sgt. Russell fabricated evidence, passed it off to prosecutors as authentic, and thereby caused Mr. Sanford to be imprisoned for nine years.

86.    In 2019, then-Lieutenant Russell was removed from the Homicide Section and stripped of his gun and arrest powers. By 2022, Sgt. Russell was separated from the DPD and placed on the WCPO *Giglio* list. This information, which is relevant to Sgt. Russell's credibility and the propriety of the police investigation in this case, was not available to the defense at the time of Plaintiff's trial.

87.    In 2003, then-Detroit Police Homicide Sgt. Donald Olsen cut corners and used unconstitutionally sloppy practices to wrongfully arrest and convict Aaron Salter of first-degree murder and assault with intent to murder. After serving 14 years in prison at the hands of Defendant Olsen, Mr. Salter's criminal charges were dismissed. This information, which is relevant to the propriety of the investigation it this case, was not available at the time of Plaintiff's trial.

*New Evidence*

88.     When confronted about the alteration of the Original Fire Report and the failure to disclose the Zippo lighter's existence to Plaintiff's defense counsel, Defendant McNulty offered no explanation for the obvious manipulation of the report, though he acknowledged the importance of finding a lighter at the fire's origin and the necessity of seizing and forensically examining such an item for the presence of fingerprints. Defendant McNulty's investigative file remains missing. **Exhibit 15, pp. 10.**

89.     In 2022, the State Appellate Defender Office offered Plaintiff the opportunity to participate in a polygraph examination. Plaintiff enthusiastically accepted. Christopher J. Lanfear, Certified Polygraph Examiner, conducted a polygraph examination of Plaintiff on June 30, 2022. Mr. Lanfear asked two questions: whether Plaintiff started the Fielding house fire on August 20, 2012, and whether he was present when the fire started. Plaintiff answered "no" to both questions.

90.     Mr. Lanfear concluded that, based on the analysis of the polygraph testing, Plaintiff was being truthful.

91.     Mr. Lanfear corroborated the findings of the polygraph results by using two scoring systems to analyze the test results.

92.    In 2023, while Plaintiff's case was under review, Dr. Alecia Wilson, the medical examiner who testified at Plaintiff's trial, informed the WCPO CIU and the State Appellate Defender Office ("SADO") that, given the information available today, the manner of death for Mr. Cross and Mr. Simms should be "undetermined," rather than "homicide." **Exhibit 15, pp. 10.**

93.    Further, when consulted by the Michigan Innocence Clinic, Fire Investigator Mr. Fennel concluded that "the fire should remain as '[u]ndetermined' classified fire" because "there is insufficient evidence to suggest that this fire is an intentional fire based on the definition of the National Fire Protection Association (NFPA) 921-Guide for Fire and Explosion Investigation."

*Exoneration*

94.     On June 18, 2024, at a hearing before Judge Bradley Cobb, Valerie Newman, the director of the Wayne County CIU, stated that her office's investigation found that the errors and *Brady* violations in Plaintiff's case were so significant as to undermine the integrity of the trial. **Exhibit 15, pp. 13.**

95.    In the same hearing, Judge Cobb agreed that the state had failed to disclose exculpatory evidence at trial and granted the motion to vacate Plaintiff's sentence. Judge Cobb ordered Plaintiff to be immediately released on bond.

96.    On October 17, 2024, the state dismissed the case against Plaintiff.

*Wayne County and the City of Detroit's Customs and Policies that Led to Plaintiff's Wrongful Conviction*

97.    In and before August 20, 2012, the date of the Fielding house fire, Wayne County and the City of Detroit, by and through its final policymakers, had a custom and policy to authorize, condone, tolerate, and approve illegal and unconstitutional actions by DPD officers, DFD investigators, and WCPO detectives and prosecutors.

98.    The illegal and unconstitutional actions and practices included but were not limited to:

a.  Conducting inadequate investigations into serious felony cases, such as alleged arson and/or murder, in order to expeditiously close cases, and affirmatively choosing not to develop or pursue actual evidence;

b.  Knowingly and deliberately fabricating evidence in order to manufacture probable cause to arrest and/or to strengthen a case for conviction;

c.  Knowingly tolerating *Brady* violations committed by investigators in order to improve conviction rates on felony cases; and,

d.  Knowingly failing document and turn over exculpatory evidence found at the scene.

99.    Defendants, Wayne County and the City of Detroit, through its final policymakers, further maintained a custom and policy of failing to adequately train, supervise, and/or discipline officers, investigators, detectives, and/or prosecutors concerning proper and constitutionally adequate evidence collection, analysis, and disclosure, including their duty not to fabricate evidence and their affirmative duty to disclose apparent exculpatory and impeachment evidence.

100.   Wayne County and the City of Detroit's customs and policies as set forth above, demonstrate deliberate indifference to the constitutional rights of its citizens, including Plaintiff, and were the moving force behind the Individual Defendants and other unknown individuals' constitutional violations.

***Plaintiff's Damages***

101.   Plaintiff has suffered tremendously because of the Individual Defendants' misconduct.

102.   Plaintiff spent over a decade in prison for a crime that did not occur. He was released from prison to broken family ties, severe reputational harm, and ostracization. He is now attempting, with great difficulty, to rebuild his life.

103.   Additionally, the emotional pain and suffering caused by losing over a decade in the prime of his life has been substantial. During his wrongful incarceration, Plaintiff was stripped of the various pleasures of basic human experience, which all free people enjoy as a matter of right. Plaintiff missed out on the ability to enjoy his earlier years, raise a family, and share holidays, birthdays, and other life events with his loving wife, and on the fundamental freedom to live one's life as an autonomous human being.

104.   Plaintiff's years of being wrongfully targeted and wrongfully incarcerated forced him into a world of isolation in which he lost contact with his friends and family in the outside world. Because of Defendants' misconduct,

Plaintiff has been unable to repair many of those lost relationships. Due to his damaged reputation, his educational and career prospects have been derailed and the course of his life has been fundamentally altered.

105. Defendants' illegal acts were the direct and proximate cause of Plaintiff's conviction and subsequent deprivation of liberty. Plaintiff suffered the following injuries and damages set forth below:

   a. A deprivation of liberty by being wrongfully incarcerated and imprisoned for over a decade;

   b. Physical pain and suffering endured during Plaintiff's wrongful incarceration, including but not limited to the exposure to the dangers and traumas of prison life;

   c. Mental health issues, including but not limited to depression, anxiety, and post-traumatic stress disorder;

   d. Severe emotional distress for the period from his arrest to the present, including, but not limited to, the emotional distress of being charged and convicted of crimes the Plaintiff knew did not occur;

   e. Physical manifestations of emotional distress including, but not limited to, sleeplessness, irritability, loss of appetite, headaches, and other symptoms;

   f. Fright, shock, indignity, humiliation, outrage, and embarrassment of being wrongfully charged and imprisoned for homicide;

   g. Loss of reputation and standing in the community;

   h. Ongoing stigma associated with wrongful conviction;

   i. Loss of enjoyment of daily activities;

j.  Restricted and/or complete loss of all forms of personal freedom and physical liberty, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, family relations, recreational activities, personal expression, and missed opportunities for personal growth, travel, and life experiences;

k.  Loss of career opportunities and earning potential;

l.  Loss of economic benefits from employment, including wage loss;

m.  Ongoing difficulties in adjusting to life post-exoneration, including challenges in finding employment and housing;

n.  Many of Plaintiff's injuries and damages are likely to be permanent; and,

o.  Other damages which may be revealed through discovery.

106.   The damages suffered by Plaintiff are ongoing and will continue into the future. The trauma of wrongful conviction and incarceration has long-lasting effects that will require ongoing medical and psychological treatment.

107.   The conduct of Defendants was reckless, malicious, and displayed a callous disregard for the federally protected rights of Plaintiff. As such, this conduct merits an award of punitive damages to deter similar conduct in the future.

## CLAIMS FOR RELEIF

### COUNT I
### *BRADY* VIOLATIONS
### *AGAINST DEFENDANTS MCNULTY, RUSSELL, AND OLSEN*

108.   Plaintiff repeats and re-alleges the foregoing paragraphs as if set forth fully herein.

109.    The Due Process Clause of the Fourteenth Amendment provides that no state may "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. XIV, §1.

110.    Suppression of material evidence favorable to the accused violates due process, irrespective of the good faith or bad faith of the prosecution. *Brady v. Maryland*, 373 U.S. 83 (1963).

111.    Defendants McNulty, Russell, and Olsen conspired to and/or withheld exculpatory and impeachment evidence, including but not limited to:

    a.  The Zippo-style lighter;

    b.  The Original Fire Report;

    c.  Photographs of a lighter found at the fire scene;

    d.  A home-interview with Ms. Cross;

    e.  A statement from Ms. Cross on the morning of the fire; and,

    f.  A statement from Ms. Simms on the morning of the fire.

112.    Specifically, Defendants illegally suppressed evidence of a Zippo-style lighter found at the fire's point of origin – evidence that supported the defense theory of an accidental fire caused by careless smoking.

113.    Defendants knowingly violated their duties to disclose to Plaintiff all material evidence since their exculpatory and impeachment value were apparent.

114.   This evidence was obviously favorable to Plaintiff because it would have impeached Defendant McNulty's testimony and supported the defense theory that the Fielding house fire was accidental in nature, rather than arson.

115.   The Defendants' failure to test and produce the lighter was undoubtedly in bad faith where the lighter's existence was concealed from the defense until the City of Detroit Law Department responded to SADO's FOIA request eight years after trial.

116.   The evidence was material because "there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different." *People v. Chenault*, 495 Mich. 142, 150 (2014) (*quoting United States v. Bagley*, 473 U.S. 667, 682 (1985)).

117.   Defendants' suppression of this evidence caused Plaintiff to suffer prejudice because there is a reasonable probability that the suppressed evidence would have produced a different verdict.

118.   Had Defendants disclosed the *Brady* material, there would have been no arrest, much less a conviction.

119.   A re-trial that included the *Brady* evidence would result in a directed verdict or acquittal.

120.   The *Brady* evidence cited above would have been apparent to any reasonable officer and/or investigator acting in good faith.

121.    Plaintiff's right to be provided with material exculpatory and impeachment evidence was clearly established long before Plaintiff was investigated and arrested.

122.    The *Brady* violations committed by Defendants resulted in Plaintiff not receiving a fair trial, that being a trial resulting in a verdict worthy of confidence.

<u>**COUNT II**</u>
**FOURTH AND FOURTEENTH AMENDMENT**
**"FABRICATION OF EVIDENCE"**
***AGAINST DEFENDANTS MCNULTY, RUSSELL, AND OLSEN***

123.    Plaintiff repeats and re-alleges the foregoing paragraphs as if set forth fully herein.

124.    The Due Process Clause of the Fourteenth Amendment is violated when evidence is knowingly fabricated, and a reasonable likelihood exists that the false evidence would have affected the decision of the jury. *Gregory v. City of Louisville*, 444 F.3d 725, 737 (6th Cir. 2006).

125.    Plaintiffs' constitutional right to be free from arrest and prosecution based upon fabrication of evidence by government officers acting in a governmental capacity to manufacture probable cause for an arrest was clearly established before Defendants began fabricating evidence against Plaintiff.

126.    Defendants McNulty, Russell, and Olsen conspired to and/or violated Plaintiff's Fourteenth Amendment right when they fabricated false testimony and other evidence, which include, but are not limited to, the following ways:

a. Deliberately altering the Original Fire Report to remove all mention of a Zippo lighter found at the fire's point of origin thereby reducing the report from seven to six pages;

b. Deliberately concealing photographs of the fire scene, including two photographs depicting a lighter in the debris, thereby fabricating testimony about the fire scene's investigation and its findings;

c. Falsely testifying as an expert regarding the existence and documentation of a Zippo lighter which experts widely agree could have caused the accidental fire underlying Plaintiff's wrongful conviction;

d. Falsely testifying that there was an absence of smoking materials at the fire's origin point;

e. Falsely testifying that a search for ignition sources yielded **only** co-axial wiring;

f. Deliberately suppressing Mr. Seabrooks' statement that directly contradicted Mr. Jennings' testimony;

g. Deliberately suppressing Mr. Roger's statement directly contradicting Ms. Simms and Ms. Cross' testimony;

h. Deliberately suppressing Ms. Cross' home-interview with a DPD officer;

i. Deliberately suppressing Ms. Cross' statement on the morning of the fire;

j. Deliberately suppressing Ms. Simms' statement on the morning of the fire; and,

k. Other fabrications of evidence that will be discovered in the course of this litigation.

127.   Defendants knowingly fabricated the above-referenced evidence, and a reasonable likelihood exists that the false evidence would have affected the decision of the jury.

128.   Defendants deliberately fabricated the above-referenced evidence to criminally charge, arrest, prosecute, detain, and convict Plaintiff.

129.   Defendants continued their investigation into Plaintiff's alleged involvement, despite the fact that they knew Plaintiff was innocent and/or Defendants were deliberately indifferent to Plaintiff's innocence, and the results of the investigation were used to criminally charge, arrest, prosecute, detain, and convict Plaintiff.

130.   Defendants' fabrication of evidence caused the initiation and continuation of criminal proceedings against Plaintiff and was used to deprive Plaintiff of his liberty.

131.   At all relevant times, it was clearly established that the Fourteenth Amendment right to due process prohibits a knowing and deliberate use by investigators of fabricated evidence in order to obtain a conviction.

## COUNT III
## FEDERAL MALICIOUS PROSECUTION
### *AGAINST DEFENDANTS MCNULTY, RUSSELL, AND OLSEN*

132.   Plaintiff repeats and re-alleges the foregoing paragraphs as if set forth fully herein.

133.   At all times, Plaintiff had a constitutional right, secured by the Fourth and Fourteenth Amendments, not to be seized and deprived of liberty as a result of fabricated evidence and knowingly or recklessly made false statements and/or material omissions by government officials in order to manufacture probable cause for arrest and continued detention.

134.   Defendants McNulty, Russell, and Olsen influenced or participated in the initiation of criminal prosecution when they deliberately fabricated and altered evidence, including manipulating the Original Fire Report to remove reference to the Zippo lighter found at the scene, which was material to a finding of probable cause, continued detention, and Plaintiff's ultimate conviction.

135.   Defendants further influenced and participated in the initiation of criminal prosecution when they deliberately and knowingly made false statements and/or material omissions in their reports and testimony and concealed the existence of the Zippo-style lighter and Original Fire Report, which were material to a finding of probable cause and Plaintiff's ultimate arrest and continued detention.

136.   But for the Defendants' fabricated evidence, deliberate false statements and/or material omissions in reports and sworn testimony, probable cause would have been lacking; such conduct constituting a claim of federal "malicious prosecution." *See Mills v. Barnard*, 869 F.3d 472, 480 (6th Cir. 2017) ("The

prototypical case of malicious prosecution involves an official who fabricates evidence that leads to the wrongful arrest or indictment of an innocent person.").

137. Plaintiff received a favorable termination of his criminal case on October 17, 2024, when criminal charges were dismissed without prejudice by the WCPO following the discovery of significant *Brady* violations and undisclosed exculpatory evidence.

138. Plaintiff's constitutional right to be free from illegal seizure and continued detention without probable cause based on fabricated evidence and/or false statements and/or material omissions by government officers was clearly established at all relevant times.

## <u>COUNT IV</u>
## STATE LAW MALICIOUS PROSECUTION
### *AGAINST DEFENDANTS MCNULTY, RUSSELL, AND OLSEN*

139. Plaintiff repeats and re-alleges the foregoing paragraphs as if set forth fully herein.

140. The underlying criminal proceedings against Plaintiff ultimately terminated in his favor with a dismissal of the charges in state court on October 17, 2024.

141. The criminal investigation and prosecution were undertaken without probable cause or good faith and with malice. They were not undertaken with the intention of bringing true justice to the community. The Defendants' manufactured

probable cause by fabricating evidence, including, but not limited to, failing to test and produce the lighter found at the fire's point of origin, altering the Original Fire Report to conceal the lighters discovery, withholding countless exculpatory witness statements and photographs, and presenting false testimony to the jury. The Defendants knew that absent fabricated evidence, probable cause for arrest or continued detention was lacking. The Defendants simply wanted to expeditiously close a case.

142.   As a direct and proximate result of Defendants' malicious prosecution, Plaintiff was charged and convicted of crimes that did not occur, causing him to suffer the special injuries and damages set forth above.

143.   Defendants' conduct constitutes malicious prosecution under MCL 600.2907 and the common law of the State of Michigan.

## **COUNT V**
## **CONSPIRACY TO DEPRIVE CONSTITUTIONAL RIGHTS**
### *AGAINST DEFENDANTS MCNULTY, RUSSELL, AND OLSEN*

144.   Plaintiff repeats and re-alleges the foregoing paragraphs as if set forth fully herein.

145.   42 U.S.C. §1985 provides, in pertinent part:

a. If two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property …, the party so injured or deprived may have an action for the recovery of damages

occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. §1985(2), (3).

146.  Defendants McNulty, Russell, and Olsen acting within the scope of their employment and under color of law, agreed among themselves and with other unknown individuals to act in concert in order to deprive Plaintiff of his constitutional rights, including his rights to Due Process, as described in the preceding paragraphs of this Complaint.

147.  Defendants had a plan to fabricate and withhold evidence; the Defendants shared a conspiratorial objective to deprive Plaintiff of his constitutional rights; and overt acts were committed in furtherance of the conspiracy that caused Plaintiff's injuries.

148.  Defendants planned to withhold information from Plaintiff's defense attorney for the purpose of obstructing justice and wrongfully convicting Plaintiff.

149.  The agreements to deprive Plaintiff of his constitutional rights and the overt acts committed in furtherance of those agreements include, but are not limited to, the following:

   a.  From the initial fire investigation, Defendant McNulty documented finding a Zippo lighter at the fire's origin point and photographed its location, yet deliberately failed to test or produce the lighter;

   b.  Despite having clear evidence of an accidental fire caused by a known smoker, Defendants orchestrated a scheme to manufacture an arson case, deliberately ignoring physical evidence;

37

c. Defendants altered official documents, including reducing Defendant McNulty's Original Fire Report from seven to six pages, and removed all references to smoking material that would have supported an accidental cause;

d. After manipulating the Original Fire Report, Defendants concealed the existence of the Original Fire Report;

e. Defendants concealed fifty-eight (58) photographs documenting evidence of an accidental fire, including two photographs of a lighter at the fire's point of origin;

f. Throughout the investigation, Defendants' deliberately ignored witness accounts that conflicted with their pursuit of a wrongful conviction;

g. Defendants failed to produce material impeachment and exculpatory evidence to Plaintiff and his trial counsel ahead of trial;

h. Throughout the proceedings, Defendants maintained their deception by falsely testifying under oath as to the fruits of their investigation;

i. For over a decade, Defendants maintained their coordinated deception, allowing an innocent man to remain imprisoned while evidence proving his innocence remained in their files; and,

j. Other agreements and overt acts that will be discovered in the course of this litigation.

150. The corrupt agreements to conceal the existence of a lighter at the fire's point of origin and to submit false testimony about Defendants' investigation and the fruits of Defendants' investigation violated Plaintiff's constitutional rights.

151. Defendants knew the fire report stipulated to at the preliminary hearing and trial testimony of Defendant McNulty was false.

152.   The existence of a lighter at the fire's point of original and the trial expert testimony of Defendant McNulty was material because there is a reasonable likelihood that it could have affected the results of the proceedings.

153.   Had the jury been apprised of the truth, it would have known that physical evidence supporting an accidental fire existed and Defendant McNulty's expert testimony regarding the cause of the Fielding house fire was false.

154.   Revealing the truth to the jury would have resulted in Plaintiff's acquittal.

155.   In furtherance of the conspiracy, each of the co-conspirators engaged in and facilitated overt acts, including but not limited to those set forth above—such as fabricating and withholding evidence—and was an otherwise willful participant in joint activity.

156.   Defendants conspired to obstruct the due course of justice in violation of 42 U.S.C. §1985(2), deny Plaintiff equal protection of the laws in violation of §1985(3), and deprive Plaintiff under color of state law of rights, privileges and immunities secured by the Constitution and laws in violation of §1983.

**COUNT VI**
**GROSS NEGLIGENCE**
*AGAINST DEFENDANTS MCNULTY, RUSSELL, AND OLSEN*

157.   Plaintiff repeats and re-alleges the foregoing paragraphs as if set forth fully herein.

158.   Defendants' conduct, i.e. gross negligence, was the cause in fact of Plaintiff's wrongful conviction and eleven years of unjust imprisonment.

159.   The gross negligence of the Defendants was the most immediate, efficiency, and direct cause of Plaintiff's wrongful conviction and resulting damages.

160.   As a result of the Defendants' gross negligence, Plaintiff suffered severe mental anguish, loss of liberty, and irreparable damage to his life, reputation, and relationships.

161.   Notwithstanding the Defendants' legal duties and obligations and in complete derogation of same, the Defendants, their agents, servants and/or employees, committed one or more of the following negligent, careless, grossly negligent and/or reckless acts and/or omissions, including, but not limited to failure to follow protocol and failure to inspect, i.e. failure to properly collect and preserve evidence knowing the likelihood that physical evidence would be essential to determining the cause of the fire and establishing Plaintiff's innocence. And further, lied under oath in a murder trial about having found a zippo-style lighter at the scene and wrongfully and fraudulently advised the court and jury that the search revealed no smoking materials and no potential ignition sources. All in violation of MCLA 691.1407(2).

162.   Defendants further breached their duty by apprehending Plaintiff, causing him to be apprehended, and/or prosecuted without probable cause and further, Defendants breached the aforementioned duty by engaging in conduct more specifically set forth above, but not limited to withholding exculpatory evidence in violation of *Brady v. Maryland*.

**<u>COUNT VII</u>**
**MONELL**
***AGAINST DEFENDANTS WAYNE COUNTY AND THE CITY OF DETROIT***

163.   Plaintiff repeats and re-alleges the foregoing paragraphs as if set forth fully herein.

164.   Defendants Wayne County and the City of Detroit, created policies, practices, and customs, as set forth above, including a failure to provide adequate training to its police officers, fire investigators, detectives, and prosecutors, including, but not limited to, Defendants McNulty, Russell, Olsen, and other unknown individuals, which demonstrated "deliberate indifference" to the constitutional rights of its citizens, and was the moving force behind the violations of Plaintiff's constitutional rights.

165.   As a direct and proximate result of Defendants McNulty, Russell, Olsen and other unknown individuals' willful violations of Plaintiff's constitutionally protected rights, Plaintiff was detained without probable cause, charged with crimes that did not occur, wrongfully convicted and jailed and imprisoned for over eleven

(11) years, and deprived of his liberty, causing him to suffer the injuries and damages set forth above.

## **PRAYER FOR RELEIF**

**WHEREFORE**, Plaintiff, DUANE LAMAR SMITH, prays for damages against Defendants for his wrongful detention and imprisonment, in violation of the Constitution, including:

a. Past and future compensatory damages as to Defendants, in a minimum amount of **Fifty Million Dollars ($50,000,000.00)**;

b. Punitive damages as to Defendants, in a minimum amount of **Fifty Million Dollars ($50,000,000.00)**;

c. Reasonable attorney fees and costs pursuant to 42 U.S.C. §1988;

d. Costs and disbursements of this action pursuant to 42 U.S.C. §1920;

e. All damages allowed under MCL 600.2907 and the common law of the State of Michigan, together with pre-judgment interest, costs and attorney fees allowed under state law; and,

f. Such other and further relief that is just and proper.

Respectfully submitted,

**FLOOD LAW, PLLC**

/s/ Todd F. Flood
**TODD F. FLOOD (P58555)**
155 W. Congress St., Ste. 350
Detroit, MI 48226

PH: (248) 547-1032
FX: (248) 547-1040
tflood@floodlaw.com

Dated: July 22, 2025

### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

DUANE LAMAR SMITH,

      Plaintiff,                       Case No.
                                            Hon.

v.

WAYNE COUNTY, a political subdivision,
of the State of Michigan, CITY OF DETROIT,
a municipal corporation, PATRICK MCNULTY,
in his individual and official capacity, MICHAEL
RUSSELL, in his individual and official capacity,
And DONALD OLSEN, in his individual and
official capacity.

      Defendants.

_____

FLOOD LAW, PLLC
Todd F. Flood (P58555)
Allexa Otto (P87961)
*Attorneys for Plaintiff*
155 W. Congress St., Ste. 350
Detroit, MI 48226-3267
PH: (248) 547-1032
FX: (248) 547-0140
tflood@floodlaw.com
aotto@floodlaw.com

_____

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff, DUANE LAMAR SMITH, by and through his attorneys, FLOOD

LAW, PLLC, hereby demands a trial by jury on all issues of this action.

Respectfully submitted,

**FLOOD LAW, PLLC**

/s/ Todd F. Flood
**TODD F. FLOOD (P58555)**
155 W. Congress St., Ste. 350
Detroit, MI 48226
PH: (248) 547-1032
FX: (248) 547-1040
tflood@floodlaw.com

Dated: July 22, 2025