UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **DUANE LAMAR SMITH,**<br><br>Plaintiff,<br><br>**v.**<br><br>**PATRICK MCNULTY, MICHAEL RUSSELL, DONALD OLSEN, WAYNE COUNTY, and CITY OF DETROIT,**<br><br>Defendants. | **2:25-CV-12231-TGB-KGA**<br><br>HON. TERRENCE G. BERG<br><br>**ORDER DENYING DEFENDANTS' MOTION TO STRIKE ALLEGATIONS (ECF NO. 27),**<br><br>**GRANTING CITY OF DETROIT'S MOTION TO DISMISS (ECF NO. 28),**<br><br>**GRANTING WAYNE COUNTY'S MOTION TO DISMISS (ECF NO. 29),**<br><br>**GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT (ECF NO. 38)** |

Plaintiff Duane Lamar Smith brought the instant 42 U.S.C. § 1983 wrongful conviction suit against individual Defendants Patrick McNulty, Michael Russell, Donald Olsen, and municipal Defendants Wayne County and the City of Detroit after it was revealed that exculpatory

evidence had been withheld during Plaintiff's criminal trial and Plaintiff was exonerated.

Presently before the Court is the individual Defendants' Motion to Strike Certain Allegations from the First Amended Complaint (ECF No. 27), the City of Detroit's Motion to Dismiss the First Amended Complaint (ECF No. 28), Wayne County's Motion to Dismiss the First Amended Complaint (ECF No. 29), and Plaintiff's Motion for Leave to file a Second Amended Complaint (ECF No. 38).

For the following reasons, the individual Defendants' Motion to Strike Certain Allegations (ECF No. 27) will be **DENIED**, the City of Detroit's Motion to Dismiss (ECF No. 28) will be **GRANTED**, Wayne County's Motion to Dismiss (ECF No. 29) will be **GRANTED**, and Plaintiff's Motion for Leave to file a Second Amended Complaint (ECF No. 38) will be **GRANTED IN PART** and **DENIED IN PART**.

## I. BACKGROUND

Plaintiff Duane Lamar Smith was 43 years old at the time of his wrongful conviction in the Fall of 2013. 1st Am. Compl. ("FAC"), ECF No. 25, ¶ 4. Plaintiff is also known as Duane Lamar Williams. *Id.*

### A. Fire & Investigation

The First Amended Complaint alleges that on August 20, 2012, a catastrophic residential fire occurred at 12860 Fielding Street in Detroit, Michigan, resulting in the tragic deaths of Bobby Cross and Darryl

Simms, both of whom were long-term residents of the property. *Id.* at ¶ 12. The lead fire investigator, Defendant Patrick McNulty, then-Captain for the Detroit Fire Department ("DFD"), conducted an examination of the scene immediately following the fire, and classified the fire's cause as undetermined. *Id.* at ¶¶ 14–15. Defendant McNulty documented in his fire report (the "Original Fire Report") that "a Zippo Style lighter was found in the debris of the east end of the couch." *Id.* at ¶ 16. Two photographs were taken depicting the lighter's precise location on the couch within the fire's origin point. *Id.* at ¶ 17; *see also* Exhibit 1, ECF No. 25-1, PageID.811–12. The medical examiner ruled the deaths accidental. FAC, ECF No. 25, ¶ 15.

About three months later, in late November 2012, an individual named Gary Jennings was arrested on unrelated charges. *Id.* at ¶ 20. Jennings offered information about a homicide to Defendant Michael Russell, then Sergeant with the Detroit Police Department ("DPD"). *Id.* at ¶ 21. Jennings stated, in an unrecorded interview, that he was contacted by another individual named DaShon Seabrooks who gave him information about Plaintiff Smith's alleged involvement in the Fielding house fire. *Id.* at ¶ 22. Jennings claimed he then called Plaintiff, who allegedly confessed to starting the fire. *Id.*

Another two months later, in January 2013, Defendant Russell contacted the medical examiner, who subsequently changed the manner of deaths for the two residents of the Fielding house from accidental to

"homicide," allegedly based on Jennings's uncorroborated statement. *Id.* at ¶ 24. Defendant McNulty's Original Fire Report was also altered to remove sentences regarding the discovery of the lighter and other smoking-related items, reducing the report from seven to six pages (the "Modified Fire Report"). *Id.* at ¶ 31.

**B. Arrest & Trial**

On March 4, 2013, according to Plaintiff, Jennings called Plaintiff and told him: "I lied to the police. Wherever you are leave right now." *Id.* at ¶ 25. Plaintiff was arrested the next day. *Id.* at ¶ 26.

On March 19, 2013, the Modified Fire Report was stipulated to and entered into evidence at the preliminary exam and was part of the proof of probable cause used to bind Plaintiff over for trial. *Id.* at ¶ 32–33.

During trial, beginning on August 12, 2013, the prosecution argued the Fielding house fire was intentionally set by Plaintiff. *Id.* at ¶ 38. According to the allegations of Plaintiff, Defendant McNulty falsely testified under oath, and Jane Doe Wayne County Prosecutor solicited materially false testimony from him to the effect that his search of the debris revealed no smoking materials. *Id.* at ¶¶ 39–40.

In September 2013, after adjournment of trial for Jennings's initial failure to appear, *id.* at ¶ 55, the jury convicted Plaintiff of second-degree murder, felony murder, and arson. *Id.* at ¶ 62. On October 2, 2013, the

trial court sentenced Plaintiff to a controlling sentence of mandatory life in prison without the possibility of parole. *Id.* at ¶ 63.

### C. Withheld Evidence

During the hearing on the motion to vacate the conviction, it was shown that the Original Fire Report was never disclosed to the defense, *id.* at ¶ 70, and the lighter and the photographs of the lighter were never disclosed to the prosecution nor the defense. *Id.* at ¶¶ 18, 37, 81; *see also* Exhibit 15, Tr. of Mot. Hearing to Vacate Conviction, ECF No. 25-15, PageID.977–78 ("Neither of the [the two photos of that lighter in the DPD file] were turned over to the defense or the prosecution. . . . [But] both of the [Original and Modified Fire] reports were found in the prosecutor's file, but only one of them was handed over to the defense attorney."). The existence of the lighter at the fire scene remained concealed from Plaintiff until the Original Fire Report was discovered through a Freedom of Information Act ("FOIA") request in 2021. *Id.* at ¶ 42. By omitting documentation regarding the discovery of a lighter at the fire's point of origin, Plaintiff alleges his defense counsel was deprived of critical information in preparation for trial, including, but not limited to, the lighter's condition, whether it contained fuel, exhibited signs of recent use, or bore any identifiable fingerprints or DNA, and, ultimately, whether the lighter was evidence that the fire had an accidental cause,

and therefore Plaintiff was being wrongfully accused. *Id.* at ¶¶ 34–35; *see also* Statement of Marc Fennell, ECF No. 25-4, PageID.891–93.

In addition to evidence concerning the lighter, Plaintiff alleges that exculpatory statements from DaShon Seabrooks were also withheld. Seabrooks was originally listed as a possible prosecution witness, but was later removed from the list without explanation. FAC, ECF No. 25, ¶ 51. During trial, Defendant Donald Olsen, DPD investigator, testified he personally talked to Seabrooks in February of 2013. *Id.* at ¶ 49. There is no documentation for such interview. *Id.* at ¶ 50. Wayne County Detective Domek also interviewed Seabrooks, at Jane Doe Wayne County Prosecutor's request, in July 2013. *Id.* at ¶ 46. Seabrooks explicitly stated that he did not know Jennings. *Id.* Seabrooks stated he had no knowledge regarding Plaintiff or of a house fire until Detective Domek mentioned them during his interview. *Id.* at ¶ 47. This statement was memorialized by Detective Domek, but not turned over to defense in discovery. *Id.* at ¶¶ 48, 59; *see also* Affidavit of Michael J. McCarthy, ECF No. 25-5, PageID.896 ("[D]uring my representation of [Plaintiff], I never received a copy of . . . Deshon Seabrooks' statements. I did not know that these statements existed until Ms. Menlo sent them to me [on June 21, 2023]."). Plaintiff also alleges pre-trial statements from another individual who was said to have information about Plaintiff's involvement in the fire,

Ron Rogers, were never turned over to the defense. FAC, ECF No. 25, ¶ 84.

### D. Post-Conviction & Exoneration

The FAC alleges that at no point during Plaintiff's appeals did he know, or could he reasonably have known, that a lighter had been found at the scene of the house fire, or that the fire report relied upon at trial had been altered and concealed from him. *Id.* at ¶ 64. As a result, Plaintiff appealed to the Michigan Court of Appeals on the basis that his constitutional right to confront witnesses against him had been violated at trial. He argued that the author of supplemental autopsy reports changing the cause of death from accidental to intentional did not testify, and could not be cross-examined, despite the supplemental reports being admitted into evidence. *Id.* at ¶¶ 64–66. His conviction was affirmed on February 10, 2015. *Id.* at ¶ 65; *see also People v. Williams*, No. 318856, 2015 WL 558307, at *1 (Mich. Ct. App. Feb. 10, 2015) ("[D]efendant argues that Wilson's testimony about Sung signing the supplemental reports violated his right to confront adverse witnesses. We disagree.").

Plaintiff filed a first petition for habeas corpus alleging ineffective assistance of counsel for failure to object to testimonial evidence without an opportunity for cross-examination regarding the autopsy reports. He also alleged that there was insufficient evidence presented during trial to establish that the fire was intentional rather than accidental. He

specifically argued that one of the decedents who was a habitual smoker could have carelessly started the fire. That petition was denied without prejudice on July 7, 2016 as a mixed petition containing exhausted and unexhausted grounds. *See Williams v. Palmer*, No. 16-521, 2016 WL 3625511, at *1–2 (W.D. Mich. July 7, 2016). Plaintiff filed a second petition for habeas corpus only on the exhausted ineffective assistance of counsel grounds, which was denied on the merits on January 30, 2017. *Williams v. Palmer*, No. 16-1091, 2017 WL 393385, at *2 (W.D. Mich. Jan. 30, 2017).

Following the exhaustion of Plaintiff's direct appeal, in 2021, defense counsel obtained, through FOIA requests, fifty-eight (58) previously undisclosed photographs from the fire scene investigation—including the two photographs documenting the Zippo-style lighter among the debris at the fire's origin point. FAC, ECF No. 25, ¶ 68; *see also* Exhibit 1, ECF No. 25-1, PageID.811–12. The FOIA materials also revealed the existence of Defendant McNulty's seven-page Original Fire Report. FAC, ECF No. 25, ¶ 69. As mentioned above, the photographs were not in the prosecutor's file, *id.* at ¶ 81, but the Original Fire Report was. *See* Exhibit 15, Tr. of Mot. Hearing to Vacate Conviction, ECF No. 25-15, PageID.977–78 ("Neither of the [the two photos of that lighter in the DPD file] were turned over to the defense or the prosecution. . . . [B]oth of the [Original and Modified Fire] reports were found in the

prosecutor's file, but only one of them was handed over to the defense attorney.").

Given the newly discovered information, Dr. Alecia Wilson, the medical examiner who testified at Plaintiff's trial, indicated that the manner of death for the decedents should be "undetermined," rather than "homicide." FAC, ECF No. 25, ¶ 101; *see also* Exhibit 15, Tr. of Mot. Hearing to Vacate Conviction, ECF No. 25-15, PageID.979 ("[I]f she were to testify today, the cause of death would be that these were both accidental deaths."). And Marc Fennell, expert in fire investigation, when consulted by the Michigan Innocence Clinic, concluded that "the fire should remain as '[u]ndetermined' classified fire" because "there is insufficient evidence to suggest that this fire is an intentional fire based on the definition of the National Fire Protection Association (NFPA) 921-Guide for Fire and Explosion Investigation." FAC, ECF No. 25, ¶ 102.

On June 18, 2024, during the Hearing to Vacate Plaintiff's Conviction before Judge Bradley Cobb, Valerie Newman, the director of the Wayne County Conviction Integrity Unit, stated that her office's investigation found that the errors and *Brady* violations in Plaintiff's case were so significant as to "undermine the integrity of the trial process." *Id.* at ¶ 103; *see also* Exhibit 15, Tr. of Mot. Hearing to Vacate Conviction, ECF No. 25-15, PageID.982; Exhibit 16, Stipulated Order to Vacate Convictions and Sentences Without Prejudice, ECF No. 25-16, PageID.1006, ¶¶ 42–43 (stating that Plaintiff has presented evidence

that "alleges ground for relief . . . that could not have been raised on direct appeal from the conviction and sentence and/or that there is good cause for the failure to raise such grounds in the past," that Plaintiff "has made a necessary showing at this juncture for the purposes of MCR 6.508(D)(2) that the evidence described above is newly discovered" and that he "could not have, through the exercise of reasonable diligence, discovered the evidence before or at trial and the evidence may make a different result probable on re-trial"). Judge Cobb agreed that the state had failed to disclose exculpatory evidence at trial and granted the motion to vacate Plaintiff's sentence. FAC, ECF No. 25, ¶ 107; Exhibit 16, Order to Vacate Convictions and Sentences Without Prejudice, ECF No. 25-16, PageID.1007. On October 17, 2024, the state dismissed the case against Plaintiff, FAC, ECF No. 25, ¶ 108, after he wrongfully spent over a decade in prison. *Id.* at ¶ 114.

### E. Federal Lawsuit & Pending Motions

Plaintiff filed this action on July 22, 2025 against individual Defendants McNulty, Russell, and Olsen, as well as the City of Detroit

and Wayne County. He filed a First Amended Complaint ("FAC") on September 26, 2025. In the FAC, he alleges seven counts:

> Count I: Brady Violations against the individual Defendants McNulty, Russell, and Olsen
>
> Count II: Fourth and Fourteenth Amendment violation for fabrication of evidence against the individual Defendants McNulty, Russell, and Olsen
>
> Count III: Federal Malicious Prosecution against the individual Defendants McNulty, Russell, and Olsen
>
> Count IV: State Law Malicious Prosecution against the individual Defendants McNulty, Russell, and Olsen
>
> Count V: Conspiracy to Deprive Constitutional Rights (Due Process, Equal Protection) under § 1985(2)-(3) and § 1983 against the individual Defendants McNulty, Russell, and Olsen
>
> Count VI: Gross Negligence against the individual Defendants McNulty, Russell, and Olsen
>
> Count VII: *Monell* Claim against Defendants Wayne County and the City of Detroit

ECF No. 25. The individual Defendants filed a Motion to Strike Certain Allegations in the FAC (ECF No. 27), a Motion to Dismiss the City of Detroit (ECF No. 28), and a Motion to Dismiss Wayne County (ECF No. 29). On November 16, 2025, after those motions were fully briefed, Plaintiff filed a Motion for Leave to File a Second Amended Complaint

("SAC"), notably adding allegations surrounding Count V and Count VII, and adding an eighth count as follows:

> Count VIII: § 1983 Conspiracy to Deprive Constitutional Rights against individual Defendants McNulty, Russell, and Olsen

ECF No. 38. Wayne County and the City of Detroit opposed the Motion. ECF Nos. 41 & 42. The individual Defendants have not opposed the Motion for Leave to File a Second Amended Complaint.

## II. LEGAL STANDARD

### A. Motion to Strike

A district court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. Proc. 12(f). Striking is a drastic remedy and is viewed with disfavor. *Yannotti v. City of Ann Arbor*, No. 19-11189, 2019 WL 5540982, at *3 (E.D. Mich. Oct. 28, 2019) (Edmunds, J.) (citation omitted); *see also Brown & Williamson Tobacco Corp. v. United States,* 201 F.2d 819, 822 (6th Cir. 1953) (internal citations omitted) ("Partly because of the practical difficulty of deciding cases without a factual record it is well established that the action of striking a pleading should be sparingly used by the courts."). Thus, "motions to strike . . . will be denied unless the allegations have 'no possible relation or logical connection to the subject matter of the controversy and may cause some form of significant

prejudice to one or more of the parties to the action.'" *Mayes v. EPA*, No. 05-478, 2006 WL 2709237, at *4 (E.D. Tenn. Sept. 20, 2006) (citing 5C Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1382 (3d ed. 2004)). "Ultimately, the decision to strike a pleading is firmly within the discretion of the court." *Spizizen v. Nat'l City Corp.*, No. 09-11713, 2010 WL 419993, at *2 (E.D. Mich. Feb. 1, 2010) (Rosen, J.) (citation omitted).

**B. Motion to Dismiss**

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief." A motion filed under Rule 12(b)(6) tests whether a complaint has satisfied that requirement. Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007)).

In evaluating whether a plaintiff has set forth a plausible claim, the Court accepts as true all well-pleaded factual allegations. *See Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 512 (6th Cir. 2001). "[M]ere conclusions," however, "are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 664. The Court need not "accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555

(citation modified). "Threadbare recitals of the elements of a cause of action," devoid of further factual enhancement, will not do. *Iqbal*, 556 U.S. at 678.

### C. Motion to Amend

Under Federal Rule of Civil Procedure 15(a)(2), "[t]he court should freely give leave [to amend the complaint] when justice so requires." Whether to allow an amended pleading under Rule 15(a) is within the Court's discretion. *Tucker v. Middleburg Legacy Place*, 539 F.3d 545, 551 (6th Cir. 2008). However, "courts need not give leave to amend when doing so would be futile," *SFS Check, LLC v. First Bank of Delaware*, 774 F.3d 351, 355 (6th Cir. 2014), such as "when the proposed amendment would not permit the complaint to survive a motion to dismiss" under Rule 12(b)(6), *Miller v. Calhoun Cnty.*, 408 F.3d 803, 807 (6th Cir. 2005) (citation omitted), or when there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by

amendments previously allowed, or undue prejudice to the opposing party," *Foman v. Davis*, 371 U.S. 178, 182 (1962).

## III. DISCUSSION

### A. Motion to Strike Specific Allegations (ECF No. 27)

The individual Defendants and the City of Detroit argue that certain allegations in the First Amended Complaint (ECF No. 25) should be stricken as impertinent and scandalous. *See* ECF No. 27.

#### 1. Plaintiff's Introduction

Defendants argue that various statements in Plaintiff's four-paragraph-long introduction are "scandalous," notably taking issue with the proposition that this case shows a "catastrophic failure of the criminal justice system," accusing the Defendants of "egregious conduct" demonstrating a "brazen disregard for Plaintiff's constitutional principles" and a "perversion of justice – where those sworn to protect the law become its most dangerous violators . . . ." ECF No. 27, PageID.1021 (citing FAC, ECF No. 25, PageID.726–63). Defendants assert that "superfluous descriptions" that are "not substantive elements of the cause of action . . . have no place in pleadings before the court." *Alvarado-Morales v. Digital Equip. Corp.*, 843 F.2d 613, 618 (1st Cir. 1988).

But in *Alvarado-Morales*, the court struck the use of terms such as "concentration camp," "brainwash" and "torture" and similes such as "Chinese communists in Korea" to describe the plaintiffs' workplace

experiences, which had nothing to do with these tragic historical events. The allegations in the instant case are not so impertinent or scandalous as to warrant striking them, even if Defendants see them as attacks on their morals that serve no purpose other than to inflame. The alleged "superfluous description" is not as irrelevant as a comparison to historical tragedies which had nothing to do with the underlying claim. On the contrary, Plaintiff alleges in his FAC that Defendants concealed exculpatory evidence and altered material evidence, which, if proven, could be described as "catastrophic failure of the criminal justice system" resulting in a "perversion of justice." In any event, Plaintiff's narrative introduction is not prejudicial because the Court will not consider conclusory allegations and Plaintiff "will still need to offer proof to support these factual allegations at the summary judgment stage." *Dawley v. Acme Block & Brick, Inc.*, 335 F.R.D. 122, 124 (M.D. Tenn. May 7, 2020) (denying motion to strike Plaintiff's narrative introduction).

Therefore, the Court will not strike Plaintiff's introduction from the First Amended Complaint.

**2. Complaint's Headings**

The Complaint's factual background is organized under thirteen titles, such as "The House Fire," or "Exoneration." Defendants take issue with six of those titles, on the basis that they are prejudicial, argumentative, conclusory, and designed to inflame rather than inform,

notably: "The Trial of an Innocent Man," "Perjury at Plaintiff's Trial," "The Conviction of an Innocent Man," "The Cover-Up Revealed," "Pattern Evidence of Defendants' Misconduct," and "New Evidence." But as stated, such colorful language in Plaintiff's headings will carry no prejudicial effect because the Court ignores such argumentative descriptions and Plaintiff "will still need to offer proof to support these factual allegations at the summary judgment stage." *Dawley*, 335 F.R.D. at 124. Therefore, the Court will not strike Plaintiff's headings from the First Amended Complaint.

**3. Paragraphs 90 to 93**

Finally, Defendants ask the Court to strike paragraphs 90 to 93 of the FAC which contain allegations of Defendants Russell and Olsen's prior misconduct in 2003, 2005, and 2007. Defendants take issue with the fact that the misconduct was only alleged, and the defendants were never found guilty of such misconduct. *See People v. Hill*, No. 277813, 2009 WL 1508882, at *7 (Mich. Ct. App. May 26, 2009) ("[A]s the trial court recognized, this issue came down to a credibility contest . . . . The trial court stated that Russell's testimony was credible and found that Russell did not make any promises to Hill. . . . Because the trial court is in a superior position to judge credibility, we will not second guess its findings based on credibility. Consequently, we accept the trial court's finding that Hill's statement was not influenced by promises of leniency or aid.");

*Sanford v. City of Detroit, Michigan*, 815 F. App'x 856, 859 (6th Cir. 2020) (denying qualified immunity on fabrication of evidence claim and malicious prosecution claim against Russell, holding that "a jury could find that Russell . . . fabricated critical evidence, which [he] passed off to prosecutors as authentic, which in turn caused Sanford to be imprisoned for nine years," that "Russell drafted a false confession, and . . . attributed [it] to Sanford when [giving] evidence for the case to the prosecutor"); *Salter v. City of Detroit*, 133 F.4th 527, 541 (6th Cir. 2025) (dismissing appeal of denial of qualified immunity regarding *Brady* claim against Olsen for lack of appellate jurisdiction, and affirming denial of qualified immunity regarding suggestive identification claim against Olsen, although the dissenting judge noted that "if Detective Donald Olsen is one of the [people to blame], he is way down the list").

But ¶ 90 of the FAC properly states that Russell was only "accused" and alleged of misconduct, not that he was found guilty of such. Paragraph 91 similarly states that qualified immunity was denied, not that Russell was in fact found guilty of the alleged misconduct by a judge or jury. Defendants do not make a specific argument regarding ¶ 92. And in ¶ 93, Plaintiff similarly notes that Olsen "allegedly . . . used unconstitutional sloppy practices," not that he was found guilty of such. In fact, Olsen's level of responsibility for such practices will never be determined because the Supreme Court denied certiorari in *Salter*, 133 F.4th 527, and the parties recently dismissed the case voluntarily. *See*

18-13136, ECF No. 64. Thus, it cannot be said that Plaintiff misstated the facts or used inflammatory language in ¶¶ 90, 91, and 93.

In addition, Defendants argue that these allegations are "scandalous" in that they cast "a cruelly derogatory light on a party or other person." *Johnson v. Cnty. of Macomb*, No. 08-10108, 2008 WL 2064968, at *2 (E.D. Mich. May 13, 2008) (citation omitted). In *Johnson*, the court held that "the allegations in plaintiff's complaint regarding the President of the Parks Commission's purported 'ties to organized crime' [we]re scandalous and immaterial" because plaintiffs' action was to "recover for damages or alleged violations of their civil rights, religious freedoms, and other related claims, 'none of which relate to or are based on . . . whether or not the President of the Park's Commission is related to someone with ties to organized crime.'" 2008 WL 2064968, at *2; *see also Llewellyn-Jones v. Metro Prop. Grp., LLC*, 22 F. Supp. 3d 760, 776–77 (E.D. Mich. May 27, 2014) (Lawson, J.) (striking allegation that property managers who allegedly fraudulently induced plaintiffs to purchase sham rental properties also laundered money for a designated terrorist organization as immaterial and impertinent to investors' fraud and RICO Act claims against managers). Thus, Defendants argue that the allegations in ¶¶ 90–93 are prejudicial in that they suggest a propensity for misconduct on the part of Russell and Olsen, like *Llewellyn-Jones*'s accusation that the property managers "also laundered

money for a designated terrorist organization," or *Johnson*'s accusation that the President of the Parks Commission had ties to organized crime.

But the allegations in those two cases are far more outlandish—and thus more "cruelly derogatory"—than the allegations against Russell and Olsen which are derived from factual descriptions in judicial opinions. *See Llewellyn-Jones*, 22 F. Supp. 3d at 773 (striking irrelevant allegations that defendants were connected to terrorist groups based on Facebook posts). And in those two cases, the allegations were stricken because they did not relate to the claims at hand, respectively fraud in the inducement and violation of civil rights. Here, Plaintiff argues that the allegations in ¶¶ 90–93 directly relate to his factual and legal claims, particularly his *Monell* claim. But given that the City of Detroit will be dismissed from the case, as discussed below, these allegations will not serve to establish any *Monell* claim against the City. And given that Russell and Olsen are City employees, not County employees, the allegations similarly cannot serve to establish any *Monell* claim against the County. Thus, Defendants argue that the allegations add no factual or legal substance to Plaintiff's wrongful conviction claim. But while the allegations are not relevant to the *Monell* claim anymore, they are still arguably related to the case at hand, as Plaintiff alleges the information

contained in ¶¶ 92 and 93 is "relevant to the propriety of the police investigation in this case."

Therefore, "the Court does not find that defendants have presented sufficient grounds to justify the extraordinary remedy of striking the pleading." *Mayes*, 2006 WL 2709237, at *4–5. Accordingly, Defendants' Motion to Strike Certain Allegations is **DENIED**.

**B. City of Detroit's Motion to Dismiss (ECF No. 28)**

The City of Detroit filed for Chapter 9 bankruptcy on July 18, 2013. This means that any "claim" addressed by the City's plan of adjustment, confirmed in December 2014, has been discharged and is barred against the City. *See* 11 U.S.C. § 944 (effect of confirmation); *id.* at 524(a)(2) (effect of discharge). Nevertheless, claims against the City incurred after the petition was filed "in the ordinary course of its operations" have not been discharged. ECF No. 28-4, PageID.1264, Eighth Amended Plan, Section A(2)(b) (Ordinary Course Claims). But "[d]etermining when a claim arises can be a complicated issue when the claim is based on events that span a time period beginning before the bankruptcy filing, . . . and ending during the life of a bankruptcy case and beyond." *In re Huffy Corp.*, 424 B.R. 295, 300 (Bankr. S.D Ohio Jan. 20, 2010).

That is the situation in the case at hand. The City of Detroit's Chapter 9 petition, filed in July 2013, resulted in a Plan of Adjustment, which set February 21, 2014 as the Bar Date for filing proof of claims,

and was confirmed on December 10, 2014, discharging all pre-petition claims and permanently enjoining creditors from pursuing such claims outside the bankruptcy process. The underlying events—the fire, the photographs, the modification of the Original Fire Report, Jennings's statement to the police, and Plaintiff's arrest—occurred between November 2012 and March 2013, *before* Detroit filed for bankruptcy. But Plaintiff's trial and subsequent conviction occurred in the Fall of 2013, *between* the filing and the confirmation of the bankruptcy. And not until 2021, years after the bankruptcy process *ended*, was the alleged unconstitutional misconduct discovered leading to Plaintiff's exoneration. Thus, while the City of Detroit argues that Plaintiff's claim against it was discharged in bankruptcy as a pre-petition claim, ECF No. 28, Plaintiff responds that he could not have filed the claim against Detroit pre-petition because the trial occurred post-petition and he only learned evidence had been withheld in 2021, ECF No. 36.

The question of when a claim arises under the Bankruptcy Code is governed by federal law. *In re City of Detroit, Michigan*, 548 B.R. 748, 762 (Bankr. E.D. Mich. Apr. 19, 2016) ("*Detroit I*"). Courts begin with the Bankruptcy Code's definition of a "claim," which has a "broad reach." *In re Huffy Corp.*, 424 B.R. at 300. The Bankruptcy Code under 11 U.S.C. § 101(5)(a) defines the term "claim: as any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable,

secured, or unsecured." *See also Detroit I*, 548 B.R. at 762 ("[P]re-petition claims that are "contingent" or "unmatured," and thus not presently actionable, may be discharged."); *Kilbarr Corp. v. G.S.A.* (*In re Remington Rand Corp.*), 836 F.2d 825, 832 (3rd Cir. 1988) ("[A] party may have a bankruptcy claim and not possess a cause of action on that claim."). Legislative history reveals Congress intended the "broadest available definition of claim" to capture "all legal obligations of the debtor, no matter how remote or contingent." *Detroit I*, 548 B.R. at 761 (citations omitted); *see also In re Edge*, 60 B.R. 690, 692–93 (Bankr. M.D. Tenn. 1986) ("Legislative history confirms that Congress intended the broadest definition for "claim" in bankruptcy."). "This broad definition serves the two primary goals of bankruptcy: to ensure that all creditors are treated equitably and to secure a fresh start for the debtor." *Detroit I*, 548 B.R. at 761; *see also In re Huffy Corp.*, 424 B.R. at 301 ("[A] broad definition of claim allows a bankruptcy court to deal fairly and comprehensively with all creditors in the case and, without which, a debtor's ability to reorganize would be seriously threatened by the survival of lingering remote claims and potential litigation rooted in the debtor's prepetition conduct.").

However, the statutory definition of "claims" in § 101(5) is not "boundless." *Monson v. City of Detroit*, No. 18-10638, 2019 WL 1057306, at *8 (E.D. Mich. Mar. 6, 2019) (Michelson, J.). Federal courts have developed conflicting tests involving "a balancing of bankruptcy concepts,

such as the broad definition of a claim and the purpose of a bankruptcy discharge, as well as due process concerns" to determine when a claim arises under the bankruptcy code. *In re Huffy Corp.*, 424 B.R. at 300. Although the Court of Appeals for the Sixth Circuit has yet to address these various tests, courts in the Eastern District of Michigan use the "fair contemplation" test to determine whether a claim arose *pre-* or *post*-petition. *See Detroit I*, 548 B.R. at 763 (concluding the "fair contemplation test" is "the correct approach"); *In re Spencer*, 457 B.R. 601, 606 (E.D. Mich. Aug. 22, 2011) (Cleland, J.) ("[T]he emerging consensus appears to adopt some version of the 'fair contemplation' approach."); *Sanford v. City of Detroit*, No. 17-13062, 2018 WL 6331342, at *5 (E.D. Mich. Dec. 4, 2018) (Lawson, J.) ("When determining whether a creditor's claim arose before a bankruptcy petition was filed, most federal courts, including bankruptcy courts within the Sixth Circuit, use the fair contemplation test.") (citation modified).

Under the fair contemplation test, "a claim cannot fall within the purview of section 101(5)—and thus cannot be discharged as a pre-petition claim—unless that claim could have been contemplated by the parties prior to the bankruptcy proceedings." *Monson*, 2019 WL 1057306, at *8; *see also Sanford*, 2018 WL 6331342, at *5 ("[A] claim arises when a claimant can fairly or reasonably contemplate the claim's existence even if a cause of action has not yet accrued under nonbankruptcy law."); *Detroit I*, 548 B.R. at 763 ("[A] claim is considered to have arisen pre-

petition if the creditor 'could have ascertained through the exercise of reasonable due diligence that it had a claim' at the time the petition is filed.") (citation omitted). The fair contemplation test "has the advantage of allowing the Court to examine all of the circumstances surrounding a particular claim—the debtor's conduct, the parties' pre-petition relationship, the parties' knowledge, the elements of the underlying claim—and use its best judgment to determine what is fair to the parties, in context." *Detroit I*, 548 B.R. at 763 (noting that "one approach may not fit all circumstances").

Plaintiff argues that the FAC alleges that at the time the bankruptcy petition was filed, he could not have fairly contemplated his current wrongful conviction claim because it is based on newly discovered evidence—the failure to disclose photographs of the lighter and the Original Fire Report, among other withheld evidence—that could not have been uncovered through diligence before or during the pendency of the Chapter 9 bankruptcy proceedings. *See* FAC, ECF No. 25, ¶ 106. As a result, Plaintiff did not file proof of claim prior to confirmation/Bar Date of the Bankruptcy, and he instead appealed his conviction to the Michigan Court of Appeals and filed two petitions for habeas corpus based on evidentiary challenges, rather than Brady challenges, in vain. Not until years later, after Plaintiff sent a FOIA request to the DPD, was

the withheld exculpatory evidence revealed and the case was dismissed in 2021.

There is no dispute that a wrongful conviction claim can be deemed to be a pre-petition claim even if the claim only becomes actionable after the conviction is set aside. *See Sanford*, 2018 WL 6331342, at *5 ("Sanford correctly points out that he could not have sued the City until his convictions were set aside, which did not happen until after the bankruptcy. But the courts that have considered the question uniformly have concluded that claims based on prepetition malicious prosecutions were barred, notwithstanding that the plaintiff could not file suit on his claims until his criminal conviction was overturned.").

Of course, Plaintiff had not yet been convicted when Detroit filed for bankruptcy. So, his case is not as clear-cut as other pre-petition wrongful conviction cases where the underlying events, the arrest, trial, and conviction all occurred before the bankruptcy petition was filed. *See In re City of Detroit*, No. 23-12600, 2024 WL 4349186, at *4 (E.D. Mich. Sept. 30, 2024) (Kumar, J.) ("*Detroit II*") (holding that plaintiff's wrongful conviction claim was pre-petition where "the bankruptcy court found that in 2011 and 2012, when his criminal prosecution, trial, and appeal were ongoing, Chancellor had known or believed he was the victim of a wrongful conviction resulting from false testimony, and he had argued as much to the state courts"); *Detroit I*, 548 B.R. at 766–67 (Hughes) (holding that Plaintiff Hughes's employment claim was pre-petition

because the police board had recommended her dismissal and she was appealing that decision before Detroit filed for bankruptcy). After all, it is one thing to fairly contemplate a claim for being wrongfully convicted after being *convicted*, but another to contemplate such a claim after merely being *arrested* but not yet convicted.

But while Plaintiff had yet to be convicted before the bankruptcy petition was filed, Plaintiff was already on notice of the charges against him relating to the fire, and he was already on notice that Jennings had falsely accused him, giving him reasons to believe that he was being wrongfully *prosecuted*. The Amended Complaint alleges so:

> 22. In the unrecorded statement taken by Sgt. Russell, Mr. Jennings claimed that he was contacted by DaShon Seabrooks who gave him information about Plaintiff's alleged involvement in the Fielding house fire. Mr. Jennings claimed he then called Plaintiff, who confessed to starting the fire.
>
> 25. On March 4, 2013, Mr. Jennings called Plaintiff and stated, "I lied to the police. Wherever you are leave right now."
>
> 26. Plaintiff was arrested the next day.

FAC, ECF No. 25, PageID.768. This distinguishes Plaintiff's case from one of the plaintiffs, Mr. Cook, in *Detroit I*. In *Detroit I*, the court held that Plaintiff Cook had a *post*-petition claim where Cook's alleged misconduct occurred *pre*-petition, but Cook was not on notice that misconduct charges were pending against him and he risked being discharged until *after* the bankruptcy petition was filed. 548 B.R. at 768.

Unlike Cook, there is no dispute Plaintiff not only was "informed" that charges were pending against him before the bankruptcy was filed, but he also had reasons to believe his prosecution was wrongful. While Plaintiff focuses on what he did *not* know at the time the petition was filed, it is equally important to note what Plaintiff *did* know. And Plaintiff knew more than Cook did at the time the petition was filed.

To be sure, Plaintiff did not know—and could not have known—that material exculpatory *Brady* evidence had been withheld from him. But "claims" in the context of bankruptcy are defined broadly, and courts have construed wrongful conviction claims based on *Brady* violations to be *pre*-petition even if the information was uncovered *post*-petition, so long as the claimant had reasons to suspect wrongdoing against the City before the petition was filed. *See Sanford*, 2018 WL 6331342, at *6 (holding wrongful conviction claims—including *Brady* claim—to be pre-petition even though the withheld evidence was only discovered after the Michigan State Police began an investigation into alleged police misconduct in 2015, because "[a]pplying the broad definition of claim to the facts of this case," plaintiff "had an arguably remote claim for malicious prosecution" against the City before the bankruptcy since he had repeatedly insisted, since 2008, that he was innocent and "that his confession was falsely obtained, concocted, and coerced"); *Monson*, 2019 WL 1057306, at *7 (relying on "broad" statutory definition of claim to find wrongful conviction claim against the City to be pre-petition, even though

newly discovered evidence forming the basis of a *Brady* claim for failure to disclose unidentified fingerprints to the prosecutor emerged in 2017, because "Monson fairly contemplated the factual basis for his § 1983 claims against the city" as evidenced by his attempts to overturn his conviction using both state and federal collateral appeals challenging the admissibility of his confession prior to the bankruptcy); *Burton v. Ronald Sanders*, 2021 U.S. Dist. LEXIS 8982, at *12–14 (E.D. Mich. Jan. 19, 2021) (Borman, J.) (holding plaintiff's *Monell* claim, based in part on a *Brady* claim, was barred as a pre-petition claim where the plaintiff "maintained his innocence and filed several post-judgment motions and appeals following his conviction in 1987 . . . to overturn his conviction" such that he "did not neglect his claims and the eventual invalidation of his conviction and his claims against the City were within his 'fair contemplation' before the City declared bankruptcy"); *Detroit II*, 2024 WL 4349186, at *3 (holding plaintiff reasonably could have ascertained the existence of his claims against the City since prosecutor's office dismissed pre-petition charges after reviewing conviction in 2020 and finding that search warrant affidavit allegations could not be corroborated, where plaintiff had argued to the state courts in 2011 and 2012 that he was the victim of a wrongful conviction resulting from false testimony).

In none of these cases did it matter that the plaintiff could not have known about the evidence withheld in violation of *Brady* and discovered post-petition, as long as the plaintiff could contemplate a wrongful

prosecution claim and/or his or her conviction being overturned based on false testimony, false confession, or other reason at the time the petition was filed. Thus, while Plaintiff claims he could only appeal his conviction on evidentiary grounds, rather than *Brady* grounds, that distinction is of little import,[1] so long as Plaintiff had *some* reason to suspect wrongdoing or believe his arrest and prosecution were wrongful before the City filed for bankruptcy—as evidenced here by his attempt to overturn his conviction. Because Plaintiff alleges in the FAC that Jennings told him in March 2013 that he lied to the police, ECF No. 25, ¶ 25, Plaintiff "could have ascertained through the exercise of reasonable due diligence that [he] had a claim," construed broadly, "at the time the petition [wa]s filed." *Detroit I*, 548 B.R. at 763 (citation modified).

Although Plaintiff argues it does not comport with due process principles to find his claims to be pre-petition, the fact that Plaintiff was on notice that his prosecution was spurious after Jennings told him he had lied to the police in March 2013, before the petition, suggests Plaintiff had until February 2014, after his conviction, to file a proof of claim that he had been wrongfully prosecuted or convicted. The "fair contemplation" test balances two important considerations: the claimant's due process

[1] In addition, review of Plaintiff's initial habeas petition shows that Plaintiff also argued that there was insufficient evidence presented during trial to establish that the fire was intentional rather than accidental, and that one of the decedents who was a habitual smoker could have carelessly started the fire. *See Williams v. Palmer*, No. 16-521, 2016 WL 3625511, at *1–2 (W.D. Mich. July 7, 2016).

rights with the debtor's need to "secure a fresh start," *Detroit I*, 548 B.R. at 761, without being "threatened by the survival of lingering remote claims and potential litigation rooted in the debtor's prepetition conduct," *In re Huffy Corp.*, 424 B.R. at 301. This type of threat is particularly serious when, as in this case, a *Monell* claim is based on an alleged "custom or pattern" of unconstitutional acts that would necessarily impute liability for pre-petition conduct.

For the foregoing reasons, the City of Detroit's Motion to Dismiss is **GRANTED**. The City of Detroit is hereby **DISMISSED** from the case. Furthermore, Plaintiff's proposed Second Amended Complaint would not cure the deficiencies mentioned herein, as further discussed below.

### C. Wayne County's Motion to Dismiss (ECF No. 29)

Wayne County challenges Count VII of the Amended Complaint on the basis that the First Amended Complaint fails to state a *Monell* claim.[2]

"A plaintiff asserting a section 1983 claim on the basis of a municipal custom or policy must 'identify the policy, connect the policy to the [County] itself and show that the particular injury was incurred because of the execution of that policy.'" *Graham ex rel. Est. of Graham v. Cnty. of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004) (citation

---

[2] Wayne County also argues it is entitled to Eleventh Amendment immunity because the prosecutor, whose actions are the basis for the underlying constitutional violation, is allegedly entitled to Eleventh Amendment immunity. The Court need not address this argument since the *Monell* claim will be dismissed for failure to state a claim.

omitted). The plaintiff "must prove two basic elements: (1) that a constitutional violation occurred; and (2) that the County 'is responsible for that violation.'" *Id.* at 382 (citation omitted). A municipality may be held liable under one of four recognized theories: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Helphenstine v. Lewis Cnty., Kentucky*, 60 F.4th 305, 323 (6th Cir. 2023).

Wayne County argues that Plaintiff only conclusively alleges the elements of a *Monell* claim based on the underlying *Brady* violation, and fails to allege any facts that would support the existence of the required elements of a municipal liability claim based on any of the four theories, and as such the *Monell* claim against Wayne County should be dismissed.

Plaintiff explains in his Response that the FAC states a Monell claim against the County because it alleges the County maintained customs, policies, and practices of tolerating *Brady* violations and investigative misconduct. ECF No. 34, PageID.1424. And in the Response's second-to-last paragraph, Plaintiff also briefly asserts that the FAC alleges that the County filed to train, supervise, and/or discipline its prosecutors and investigators regarding *Brady* obligations and evidence handling. *Id.* at PageID.1445. Plaintiff does not allege in the FAC or in his Response that Wayne County had "official written

policies" instructing Wayne County prosecutors and investigators to ignore their *Brady* obligations, or that a final decision maker for the County ratified the illegal conduct.

**1. Underlying Constitutional Violation**

Wayne County does not dispute that Plaintiff sufficiently alleged Jane Doe Wayne County Prosecutor violated her *Brady* duties when she failed to disclose the Original Fire Report to Plaintiff's defense, providing only the Modified Fire Report that omitted the existence of the lighter found at the fire's point of origin. FAC, ECF No. 25, ¶ 75; *see also* ECF No. 25-15, PageID.977–78 ("[B]oth of those reports were found in the prosecutor's file, but only one of them was handed over to the defense attorney.").

However, Wayne County argues that Plaintiff failed to plausibly allege an underlying constitutional violation on the part of Wayne County employee Detective Anthony Domek. *See Baker v. City of Trenton*, 936 F.3d 523, 535 (6th Cir. 2019) ("Municipalities may be held liable under § 1983 for constitutional violations committed by their employees . . . . However, where there has been no showing of individual constitutional violations on the part of the officers involved, there can be no municipal liability.") (citations omitted).

Plaintiff responds that he alleges in the FAC that Domek interviewed Deshon Seabrooks, who stated he knew nothing about the

fire or Gary Jennings, who had incriminated Plaintiff, ECF No. 25, ¶¶ 46–48, which could have made Jennings's trial testimony less credible, ECF No. 25-5, PageID.896. Plaintiff also alleges Domek interviewed Ron Rogers, who stated he did not know anything about who started the fire, undermining two other trial witnesses. FAC, ECF No. 25, ¶ 84. The statements Domek obtained from Seabrooks and Rogers were never disclosed to Plaintiff's defense. *Id.* at ¶¶ 48, 84; ECF No. 25-5, PageID.895–96; ECF No. 25-15, PageID.978. Plaintiff also alleges that Domek obtained Simms's medical records that were never disclosed to Plaintiff's defense. FAC, ECF No. 25, ¶ 88.

But Wayne County argues Domek's failure to disclose information to the defense is insufficient to establish a *Brady* violation on the part of Domek because Domek only had an obligation to disclose exculpatory evidence *to the prosecution*, not to the defense, and Plaintiff does not allege Domek failed to disclose the evidence *to the prosecution*, who in turn has the sole obligation to disclose that material to the defense. *See Moldowan v. City of Warren*, 578 F.3d 351, 377–78 (6th Cir. 2009) (while the *Brady* "obligation . . . to disclose exculpatory evidence to the defense . . . falls squarely on the prosecutor," officers can also violate *Brady* if they fail to "inform the prosecutor about evidence that undermine[s] the state's preferred theory of the crime"); *D'Ambrosio v. Marino*, 747 F.3d 378, 389 (6th Cir. 2014) ("*Brady* obliges a police officer

to disclose material exculpatory evidence only to the prosecutor rather than directly to the defense . . . .").

While Plaintiff argues that determining "what level the suppression occurred is a factual issue for discovery, not a basis for dismissal," at this stage Plaintiff must still plausibly allege Domek failed to disclose the evidence *to the prosecution*. He fails to do so. As currently pleaded, it is just as possible that Domek disclosed the evidence to the prosecutor, who then failed to disclose the evidence to the defense. *See D'Ambrosio*, 747 F.3d at 390 (where "there is no allegation that [the detective] knew about any obviously exculpatory evidence of which prosecutors were ignorant and failed to apprise them of it," and the "complaint faults [the detective] . . . for being 'privy to' exculpatory information that he did not pass along to" the defendant, "the complaint fails to plausibly allege that the suppression of any of the obviously exculpatory evidence in this case was caused by [the detective]'s abdication of his constitutionally required duties").

Therefore, while Wayne County may be liable under *Monell* based on Jane Doe Prosecutor's alleged unconstitutional conduct, it cannot be based on Detective Domek's alleged unconstitutional conduct.

**2. Policy of Inaction**

Plaintiff points out that the FAC alleges the County maintained customs, policies, and practices of tolerating *Brady* violations and

investigative misconduct. To succeed on a municipal-liability claim under an "inaction" theory, a plaintiff must show "(1) the existence of a clear and persistent pattern of" unconstitutional conduct; (2) "notice or constructive notice" on the part of the municipality; (3) the municipality's "tacit approval of the unconstitutional conduct, such that [its] deliberate indifference in [its] failure to act can be said to amount to an official policy of inaction"; and (4) "that the [municipality's] custom was the 'moving force' or direct causal link in the constitutional deprivation." *Franklin v. Franklin Cnty., Kentucky*, 115 F.4th 461, 472 (6th Cir. 2024) (citation omitted). "Deliberate indifference is a stringent standard of fault," and "the risk of a constitutional violation arising as a result of the inadequacies in the municipal policy must be 'plainly obvious.'" *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) (citations omitted).

Plaintiff conclusively alleges the County maintained customs and policies to "authorize, condone, tolerate, and approve illegal and unconstitutional actions" by prosecutors, including "knowingly tolerating *Brady* violations . . . to improve conviction rates" and "knowingly failing to document and turn over exculpatory evidence," demonstrating deliberate indifference and causing the prosecutor's conduct in this case. FAC, ECF No. 25, ¶¶ 109–10, 112. In support of this conclusion, Plaintiff relies on allegations of misconduct in *this* case, in *prior* cases, and in *publicly available* wrongful conviction data. Defendant argues those allegations fail to show a "clear and persistent pattern" of

unconstitutional conduct of which Wayne County would have had constructive notice such that its "tacit approval" would rise to deliberate indifference and be the moving force behind the violation in this case.

*Misconduct in this case.* Plaintiff argues the alleged constitutional violations in this case were not a single incident, but rather a coordinated series of actions committed by multiple Wayne County Prosecutor's Office employees over many months. But that argument is weakened by the fact that only Jane Doe Prosecutor's unconstitutional conduct has been sufficiently alleged as a basis for the *Monell* claim, as explained above, falling short of alleging a "pattern of unconstitutional conduct." *See City of Okla. City v. Tuttle*, 471 U.S. 808, 824 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *Johnson v. Washtenaw Cnty.*, No. 24-12701, 2025 WL 2773124, at *15 (E.D. Mich. Sept. 26, 2025) (Berg, J.) ("[T]he only factual basis supporting such 'inaction theory' is the alleged disclosure violation by the officers in this case, which falls short from suggesting a 'clear and persistent pattern' of inaction.") (citation omitted); *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 406–07 (1997) ("That a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee will not alone

permit an inference of municipal culpability and causation; the plaintiff will simply have shown that the *employee* acted culpably.”).

*Prior misconduct*. Plaintiff also states that the FAC alleges previous specific prior instances of unconstitutional acts by other WCPO prosecutors, mirroring the violations in this case, causing multiple wrongful convictions, and the County took no action to stop the conduct. But the allegations of prior unconstitutional conduct Plaintiff refers to are about the specific conduct of two *Detroit Police Department* officers, Russell and Olsen, dating from 2003, 2005, and 2007, regarding Russell’s fabrication of evidence that he “passed . . . off to the prosecutors as authentic,” and Olsen’s use of “unconstitutionally sloppy practices.” FAC, ECF No. 25, ¶¶ 90–95. These allegations do not specify whether the practices mirror the *Brady* allegations in this case, whether any Wayne County employee may have been directly involved or aware of the violations, or whether the cases otherwise involved any prosecutorial misconduct such as knowingly withholding the information from the defense. *See Franklin v. Franklin County*, 115 F.4th 461, 472 (6th Cir. 2024) (noting that “prior examples of wrongdoing must violate the same constitutional rights [as the plaintiff’s] and violate them in the same way” to constitute a “pattern of similar constitutional violations”). In fact, Plaintiff states that from those allegations, “Defendant *City of Detroit* had actual and constructive notice of repeated constitutional violations of the nature alleged herein”—not Wayne County. FAC, ECF No. 25, ¶ 94

(emphasis added). As to Wayne County specifically, the complaint only conclusively alleges that "[u]pon information and belief, Jane Doe Wayne County Prosecutor has previously engaged in similar unconstitutional practices, including, but not limited to, *Brady* violations, thereby placing Defendant Wayne County on notice of constitutional violations of the nature alleged herein." *Id.* at ¶ 95. This is a conclusory statement and falls short of alleging a "clear and persistent pattern" of unconstitutional violations.

*Public data.* Plaintiff further cites public data in his Response that he did not include in his First Amended Complaint. But even considering the data offered by Plaintiff, it does not warrant an inference that the County was deliberately indifferent to a clear and persistent pattern of unconstitutional conduct by its employees at the time Plaintiff was convicted. Plaintiff argues that, according to the National Registry of Exonerations, between 2000 and 2013, before Plaintiff's trial and conviction, 43 people in Wayne County had been exonerated, including 21 exonerations involving withheld exculpatory evidence, which provides constructive notice to the County of the unconstitutional deprivations occurring at the time, plausibly establishing that the County had a custom of tolerating clear and persistent violations of constitutional rights. *See Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 407 (1997) ("[Municipal decisionmakers'] continued adherence to an approach that they know or should know has failed to prevent tortious

conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability.").

But setting aside whether those numbers are sufficient to show behavior "so permanent and well settled as to constitute a 'custom or usage' with the force of law," *Monell v. Dep't of Public Services*, 436 U.S. 658, 691 (1978), the data mentioned does not show whether the exonerations were the result of *prosecutorial* misconduct as opposed to *police* misconduct. *See Franklin*, 115 F.4th at 472. While the National Registry of Exonerations' online interface[3] allows the Court to find some of the cases Plaintiff refers to—at least nine of them with exonerations before October 1, 2013 based on general "exculpatory evidence withheld"—it is not the Court's duty to bolster arguments for Plaintiff, and Plaintiff has not attempted to identify the names of the cases he is relying on or use specific facts to show how the cases specifically support his municipal liability claim, such as whether they involve a prosecutor having possession of *Brady* material received from the police who then failed to disclose it.

Therefore, the First Amended Complaint fails to state a policy-of-inaction claim under *Monell*. Although Plaintiff argues he could amend his pleadings to include additional factual allegations, ECF No. 34,

---

[3] *See* Nat'l Registry of Exonerations, https://exonerationregistry.org/ [https://perma.cc/7P9V-733G] (last visited Sep. 28, 2026).

PageID.1446, the additional allegations in the later-filed proposed Second Amended Complaint, including the data discussed herein and additional factual allegations about the pre-2013 exonerations, still fail to cure its deficiencies, as further explained below.

**3. Inadequate Training**

In one brief paragraph in his Response, Plaintiff asserts that the FAC alleges—albeit conclusively—that the County filed to train, supervise, and/or discipline its prosecutors and investigators regarding *Brady* obligations and evidence handling. *See* ECF No. 25, ¶¶ 111, 176. To allege a failure to train claim, a plaintiff must allege that "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Howell v. NaphCare, Inc.*, 67 F.4th 302, 319 (6th Cir. 2023); *see also City of Canton v. Harris*, 489 U.S. 378, 388 (1989) ("[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.").

Plaintiff reasons that "[g]iven he County's documented history of *Brady* violations and wrongful convictions, its failure to provide remedial training supports a finding of deliberate indifference." ECF No. 34, PageID.1445. But a plaintiff fails to state a *Monell* failure-to-train claim

where there is no "particular allegations regarding the training [the defendant] provides . . . other than it must be inadequate given the [alleged violation]." *Estate of Abbey v. Herring*, 598 F. Supp. 3d 572, 590 (E.D. Mich. Apr. 12, 2022) (Drain, J.). Here, the allegations in the FAC regarding the County's alleged failure to train are "threadbare and conclusory," preventing the Court from inferring inadequate training from the alleged unconstitutional actions by Jane Doe Prosecutor. *See Baugh v. Miller*, No. 24-11177, 2024 WL 4806485, at *3 (E.D. Mich. Nov. 15, 2024) (Leitman, J.). Therefore, the First Amended Complaint fails to state a *Monell* claim upon which relief can be granted on the basis of a failure to train as well.

Although Plaintiff argues he could amend his pleadings to include additional factual allegations, ECF No. 34, PageID.1446, it appears Plaintiff has abandoned this theory in his proposed Second Amended Complaint. Plaintiff stated in his Reply to his Motion for Leave to File a Second Amended Complaint that he "presented enough to survive a motion to dismiss under at least two avenues of Monell liability—specifically, theories (2) and (4)," but those two theories are final decisionmaking authority and policy of inaction, *not failure-to-train*.

Therefore, amendment would not cure the defects regarding the failure-to-train theory of liability.

Therefore, Wayne County's Motion to Dismiss is **GRANTED**. Wayne County is hereby **DISMISSED** from the case.

### D. Plaintiff's Motion for Leave to File Second Amended Complaint (ECF No. 38)

After briefing was completed on the previous motions, Plaintiff filed a Motion for Leave to File a Second Amended Complaint. ECF No. 38. In the Second Amended Complaint, Plaintiff seeks to (1) clarify and further elucidate upon factual allegations of prior constitutional violations and misconduct by agents of Wayne County and the City of Detroit concerning the *Monell* claim in Count VII, (2) supplant § 1985(3) conspiracy allegations in Count V, and (3) add a separate claim for civil conspiracy against the individual Defendants in a proposed Count VIII.

The individual Defendants did not challenge the proposed amendments. Therefore, the Court will permit Count V to be amended and Count VIII added, as they only involve the individual Defendants.

As to the *Monell* claim against the City of Detroit and Wayne County (Count VII), Plaintiff explains he seeks to file a Second Amended Complaint to include "additional prior instances of violations of established constitutional violations perpetrated by Defendants before his wrongful arrest and imprisonment, which evidence a custom of tolerance and acquiescence of federal rights violations, and ratification of

such actions over an extended time period." ECF No. 38, PageID.1489. Interestingly, Plaintiff no longer asserts a "failure to train" theory, but asserts a "ratification" theory that he had not vigorously argued before.

As to the City of Detroit, the amendment does not change the fact that the bankruptcy discharged Plaintiff's pre-petition claim against the City, as explained above. Therefore, amending Count VII would be futile as to the City and will not be allowed.

And as to Wayne County, it counters that the added allegations are conclusory and remain insufficient to plead a *Monell* claim.

**1. Policy of Inaction**

As to the *Monell* theory of liability based on Wayne County's alleged policy of inaction, Plaintiff includes in the Second Amended Complaint ("SAC") the public data discussed above, specifying this time that nine of the 47 documented exonerations between 2000 and 2013, before Plaintiff's trial and conviction, involved *prosecutorial* misconduct. SAC, ECF No. 38-1, ¶ 179f.[4]

Plaintiff also adds numerous allegations of misconduct in specific cases in an attempt to show a clear and persistent pattern of

[4] As explained above, the National Registry of Exonerations' website does not appear to differentiate between withholding of exculpatory evidence by prosecutors or by police officers, so the basis for the allegation that all nine of the "withholding-based" exonerations were prosecutorial misconduct is dubious. But accepting the SAC's well-pleaded facts as true at this motion-to-amend stage, the Court understands Plaintiff alleges that nine of these *Brady* violtions were committed by prosecutors.

unconstitutional violations and deliberate indifference by the County. But only *two* examples plausibly allege that Wayne County was on notice by the time of Plaintiff's trial that a *different* prosecutor in a *different* case had violated *Brady*. *See id.* at ¶ 184 (Provience); *id.* at ¶ 186 (Lee). A number of examples do not allege *Brady* violations by prosecutors. *See id.* at ¶ 182 ("complete failure to investigate"), ¶ 183 ("confession of error"), ¶ 192 (insufficient evidence), ¶¶ 189–91 (improper comments), ¶ 187 (improper comments). And the other *Brady*-related allegations are either undated, *see id.* at ¶ 188 (undated *Brady* misconduct allegation), or the date by which the County may have been on notice either cannot be reasonably inferred, *see id.* at ¶ 180 (alleging *Brady* misconduct in 2001 but not when the misconduct was revealed), ¶ 181 alleging *Brady* misconduct in 2002 but not when the misconduct was revealed), or it relates to conduct that occurred *after* Plaintiff's conviction, *see id.* at ¶ 189 (alleging that the appellate court reversed wrongful conviction based on *Brady* violation in 2016).

These defects prevent a reasonable inference that Wayne County was on notice regarding more than the two instances of *Brady*-related misconduct by its own prosecutors. Given the volume of criminal matters handled by the Wayne County Prosecutor's Office, an allegation of *nine* documented cases (including Lee's and Provience's) of prosecutorial misconduct based on *Brady* violations in Wayne County in the *thirteen* years before Plaintiff's conviction does not plausibly suggest misconduct,

Wayne County's awareness of misconduct that was, "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *See Monell*, 436 U.S. at 691.

The Court acknowledges Plaintiff's argument that discovery is needed to uncover the precise number of instances of *Brady*-based prosecutorial misconduct during that time. But before accessing discovery, Plaintiff must plausibly allege a sufficiently clear and pervasive pattern of unconstitutional conduct that Wayne County was aware of and deliberately ignored, which was the moving force behind Plaintiff's wrongful conviction. The additional allegations in the SAC still fail to show a clear pattern of unconstitutional conduct of which Wayne County had notice before Plaintiff's conviction, such that its "inaction" was the moving force of Plaintiff's injury here.

Therefore, the proposed amendment to Count VII would be futile as to Wayne County too based on a policy-of-inaction theory.[5]

### 2. Final Decisionmaking Authority

In a last-ditch attempt to save his *Monell* claim, Plaintiff asserts—for what appears to be the first time—in his Motion to File a Second Amended Complaint that his *Monell* claim rests on the theory that a

[5] This is Plaintiff's third unsuccessful attempt at stating a plausible *Monell* claim. Defendant submits that an additional basis for denying the motion to amend is Plaintiff's undue delay in seeking leave to amend and his repeated failure to cure deficiencies by amendment.

Wayne County official with final decisionmaking authority ratified the unconstitutional conduct. *See* ECF No. 38, PageID.1489 (arguing that the complaint alleges "enough to survive a motion to dismiss under . . . theor[y] (2)," that an official with final decisionmaking authority ratified illegal actions). Wayne County did not address this argument in its Response, focusing only on the "deliberate indifference" theories discussed above. Plaintiff argues in his Reply that Defendant's failure to "contest Plaintiff's other theories of *Monell* liability Wayne County" means it has "waive[d] any related futility arguments." ECF No. 44, PageID.1810 n.1. But the ratification theory was never the gravamen of Plaintiff's claim, whether in the First or Second Amended Complaint,[6] thus casting doubt on whether Defendant had a fair opportunity to respond to this last-minute recasting of Plaintiff's theory.

In any event, Plaintiff fails to state a *Monell* claim under the ratification theory as well. In *Smith v. Silvernail*, the Sixth Circuit affirmed the summary judgment dismissal of a *Monell* claim that was based on the theory that a final decisionmaker ratified a prosecutorial

---

[6] The First Amended Complaint only referred to "final policymakers" twice in the context of failure to train and maintaining a policy of inaction, rather than in the context of ratification of Jane Doe Prosecutor's alleged *Brady* violation. The Second Amended Complaint refers to "final policymakers" two additional times, with one mention of the word "ratification" among the 294 allegations.

*Brady* violation. 2025 WL 80370, at *11 (6th Cir. Jan. 13, 2025). The Sixth Circuit reasoned that:

> Plaintiff has failed to show that the *Brady* violation was ratified by the final decision-making authority in the Fairfield County Prosecuting Attorney's office. Instead, the *Brady* violation was committed and ratified only by Marx, who did not hold final authority.

*Id.*

Of course, at the motion-to-dismiss stage, Plaintiff need only *allege* that a final decisionmaking authority within the County ratified the *Brady* violation. But this Plaintiff fails to do. The Second Amended Complaint alleges that the "Wayne County Prosecuting Attorney" had "final authority with respect to the training, supervision, discipline, and overall management of personnel employed by or assigned to the WCPO with respect to all of the office's functions, and constituted a County policymaker for whose actions or omissions Defendant Wayne County is liable." ECF No. 38-1, ¶ 124. The SAC does not allege that the "Wayne County Prosecuting Attorney" ratified the alleged *Brady* violation, *Brady* violations generally, *see Smith*, 2025 WL 80370, at *11, or "created a policy that prosecutors not disclose certain 'evidence favorable to the defendant,' including 'reports' made by 'police departments' and

'statements made by witnesses.'" *See Buehner v. City of Cleveland*, 788 F. Supp. 3d 827, 886 (N.D. Ohio June 24, 2025).

Neither does the SAC plausibly allege that "Jane Doe Wayne County Prosecutor," who was assigned to Plaintiff's criminal case and allegedly committed the *Brady* violation, had final decisionmaking authority for the County or was the "Wayne County Prosecuting Attorney."[7] In fact, the SAC appears to differentiate between "[t]he Wayne County Prosecuting Attorney and her assistant prosecuting attorneys." ECF No. 38-1, ¶ 126.

Thus, Plaintiff neither alleges that the Wayne County Prosecuting Attorney "both committed the *Brady* violation and had final decision-making authority in the prosecutor's office," nor conversely, that Jane Doe Prosecutor "both committed the *Brady* violation and had final decision-making authority in the prosecutor's office." *See Smith*, 2025 WL 80370, at *10. Even construing the facts in the light most favorable to Plaintiff, they fail to allege that a final policymaker for the County ratified illegal acts as the basis for a *Monell* claim against the County.

[7] Defendant questions why Plaintiff does not name the prosecutor when he "is well-aware of the identity of the assistant prosecuting attorney who handled the case." ECF No. 37, PageID.1469 n.3.

Therefore, allowing Plaintiff to amend Count VII against Wayne County would be futile.

Therefore, Plaintiff's Motion for Leave to File a Second Amended Complaint will be **GRANTED IN PART** and **DENIED IN PART as follows:**

- Count V may be amended
- Count VIII may be added
- Count VII will be dismissed
- Defendants The City of Detroit and Wayne County will be removed as parties

Plaintiffs shall file a Second Amended Complaint as described above no later than **14 days** from the date of this order.

## IV. CONCLUSION

For the foregoing reasons, the individual Defendants' Motion to Strike Certain Allegations (ECF No. 27) is **DENIED**. The City of Detroit's Motion to Dismiss (ECF No. 28) is **GRANTED**. Wayne County's Motion to Dismiss (ECF No. 29) is **GRANTED**. Plaintiff's Motion for Leave to File Second Amended Complaint (ECF No. 38) is **GRANTED IN PART** and **DENIED IN PART** as set out above. Count VII,

Defendants Wayne County, and Defendants City of Detroit are hereby **DISMISSED** from this action.

This Order does not close the case.

**SO ORDERED**.

Dated: September 30, 2026

/s/Terrence G. Berg
TERRENCE G. BERG
UNITED STATES DISTRICT JUDGE